119 T.C. No. 9


UNITED STATES TAX COURT


GERALD A. AND HENRIETTA V. RAUENHORST, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1982-00.               Filed October 7, 2002.


     Ps owned stock warrants in NMG.  WCP sent a letter
to NMG regarding its intention to purchase all the
issued and outstanding stock of NMG.  Ps then assigned
their warrants to four charitable institutions.  At the
time of the assignments, the donees were under no legal
obligation, and could not be compelled, to sell the
warrants.  The donees subsequently sold their warrants
to WCP.  R determined that the contributions by Ps were
anticipatory assignments of income.  Ps moved for
partial summary judgment arguing that the anticipatory
assignment of income doctrine does not apply where
donees are not legally obligated, and cannot be
compelled, to sell contributed property.  Ps rely on
Rev. Rul. 78-197, 1978-1 C.B. 83.  R argues that he is
not bound by his ruling but has neither withdrawn nor
modified that ruling.

     <u>Held</u>:  Rev. Rul. 78-197, <u>supra</u>, provides that, in
the case of a charitable contribution of stock, the
Internal Revenue Service will treat proceeds of the

sale of the stock as income to the donor only if at the time of the gift, the donee is legally bound, or can be compelled, to sell the shares. We treat Rev. Rul. 78-197, supra, as a concession in the instant case. See Walker v. Commissioner, 101 T.C. 537 (1993). There remains no genuine issue of material fact regarding whether the charitable donees were legally obligated, or could be compelled, to sell the stock warrants at the time of the assignments by Ps. Accordingly, Ps are entitled to judgment as a matter of law.

John K. Steffen, Walter A. Pickhardt, and David R. Brennan, for petitioners.

David L. Zoss, for respondent.

OPINION

RUWE, Judge: The matter is before us on petitioners' motion for partial summary judgment pursuant to Rule 121.[1] Respondent determined a deficiency of $1,322,295 in petitioners' Federal income taxes, and an accuracy-related penalty of $264,459 pursuant to section 6662(a), for 1993. The issue for decision is whether the transfer of stock warrants to four charitable institutions was an anticipatory assignment of the proceeds from a sale of those warrants.

---

[1]All section references are to the Internal Revenue Code in effect for the tax year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

At the time of filing the petition, petitioners resided in Naples, Florida. Petitioners were the only partners of Arbeit & Co. (Arbeit), a general partnership.[2] NMG, Inc. (NMG), was a Delaware corporation which did business as George Rice & Sons.

On March 31, 1992, Arbeit and NMG executed an agreement which required that Arbeit surrender 2,500 shares of NMG series A preferred stock, a subordinated promissory note, and certain previously issued NMG warrants. Pursuant to this same agreement, NMG issued to Arbeit a senior subordinated promissory note of $5 million and a junior subordinated promissory note of $2.4 million. NMG also issued a warrant which gave Arbeit the right to purchase 772.14 shares of NMG class A common stock at an exercise price of $1 per share. Before November 12, 1993, Arbeit, Sieben Investment Co., Berkeley Atlantic Income, Ltd., and BG Services, Ltd., held warrants to purchase NMG class A common stock in the following amounts:

| Warrantholder | Number of Shares |
|---|---|
| Arbeit | 772.14 |
| Sieben | 18.36 |
| Berkeley | 115.41 |
| BG Services | 230.82 |
| Total | 1,136.73 |

Before December 22, 1993, NMG's outstanding stock consisted

---

[2]Arbeit's sole purpose was to act as a nominee for petitioners, as trustee of the Gerald Rauenhorst Revocable Trust. This trust was a revocable grantor trust, and its assets were treated as owned by Mr. Rauenhorst under sec. 676.

of 2,400 shares of class A common stock and 660 shares of series B preferred stock that were convertible share for share into NMG common stock. NMG's stock was owned as follows:

| Shareholder | Shares of Common Stock | Common Stock Ownership Percentage | Shares of Preferred Stock |
|---|---|---|---|
| Grossberg family[1] | 1,176 | 49.00% | 660 |
| E. James Cooper | 349 | 14.54 | 0 |
| John J. Woodlock | 349 | 14.54 | 0 |
| Randolph K. Ginsberg | 349 | 14.54 | 0 |
| John J. Zamora | 177 | 7.38 | 0 |
| Total | 2,400 | 100.00 | 660 |

[1]The Grossberg family consisted of Ewel Grossberg and June Marion Grossberg, in their capacities as trustees of the Grossberg Trust of 1983, and their children, Linda Finkel and Alan B. Grossberg.

If all preferred shares were converted into NMG common shares, and if all warrants were exercised, the following would represent the percentage ownership of NMG shares as of September 28, 1993:

| Shareholders and Warrantholders | Shares of Common Stock | Ownership Percentage |
|---|---|---|
| Grossberg family | 1,836.00 | 43.75% |
| E. James Cooper | 349.00 | 8.32 |
| John J. Woodlock | 349.00 | 8.32 |
| Randolph K. Ginsberg | 349.00 | 8.32 |
| John J. Zamora | 177.00 | 4.22 |
| Arbeit | 772.14 | 18.40 |
| Sieben | 18.36 | 0.44 |
| Berkeley | 115.41 | 2.75 |
| BG Services | 230.82 | 5.50 |
| Total | 4,196.73 | [1]100.00 |

[1]As a result of rounding the percentages, the total should actually be 100.02 percent.

On September 28, 1993, World Color Press, Inc. (WCP), wrote a letter to the chairman of the board of directors of NMG, Ewel Grossberg, in which it stated its intention to purchase all the issued and outstanding shares of NMG on the terms and conditions

outlined in the letter.  This letter of intent was signed by Robert G. Burton, as chairman, president, and CEO of WCP.  The letter was accepted by Ewel Grossberg, as chairman of NMG; by Randolph K. Ginsberg, as president of NMG; by Jim Cooper, as vice president of manufacturing of NMG; and by John Woodlock, as vice president of finance of NMG.  On October 22, 1993, WCP's board of directors adopted a resolution to negotiate and to enter into the agreement for the purchase of all the issued and outstanding capital stock of NMG.

On November 9, 1993, Arbeit executed an assignment of its rights in the NMG warrant to four institutions:  (1) The University of St. Thomas; (2) Marquette University; (3) the Mayo Foundation; and (4) the Archdiocese of St. Paul and Minneapolis, Catholic Community Foundation.  The rights to purchase 772.14 shares of NMG class A common stock were allocated as follows: (1) University of St. Thomas, 260.00 shares; (2) Marquette University, 130.00 shares; (3) Mayo Foundation, 190.00 shares; (4) Archdiocese of St. Paul and Minneapolis, 190.00 shares; and (5) Arbeit, 2.14 shares.  The donee institutions were organizations described in section 170(c)(2).

On November 9, 1993, the general manager of Arbeit wrote a letter to the chief financial officer of NMG requesting that the warrant formally held by Arbeit be reissued to reflect the assignments and that the reissued warrants be delivered by mail

to the new owners by November 12, 1993. Legal counsel for NMG sent letters dated November 11, 1993, which enclosed reissued warrants, to Arbeit, the University of St. Thomas, Marquette University, the Mayo Foundation, and the Archdiocese. The donees each acknowledged having received the reissued warrants on November 12, 1993, in letters addressed to Mr. Rauenhorst. Legal counsel for NMG requested that each of the donees execute an "Additional Party Signature Page" which related to a stockholders agreement and registration rights agreement dated March 31, 1992. On November 12, 1993, each of the donees signed an Additional Party Signature Page. Neither the Additional Party Signature Page, nor the stockholders agreement, nor the registration rights agreement bound the donees to sell their stock warrants to NMG or WCP.

On November 15, 1993, the general manager of Arbeit sent a letter to NMG and WCP in which he confirmed Arbeit's intention to surrender its warrant to purchase 2.14 shares for cash as part of WCP's acquisition of NMG stock. Arbeit executed a warrant purchase and sale agreement dated as of November 19, 1993, in which Arbeit agreed to sell its warrant (for 2.14 shares of NMG stock) to WCP for $7,598.48 per share on or before December 31, 1993. This agreement was contingent upon WCP's acquisition of all the issued and outstanding stock of NMG pursuant to a stock purchase agreement.

On November 16, 1993, legal counsel for NMG sent a letter to each of the donees enclosing a warrant purchase and sale agreement, pursuant to which each donee would agree to sell its reissued warrant to WCP. The letters requested that each donee sign the agreement and return it for receipt by NMG's legal counsel on November 18, 1993. The donees each signed a warrant purchase and sale agreement dated November 19, 1993, in which they agreed to sell their reissued NMG warrants to WCP for $7,598.48 per share on or before December 31, 1993.

On November 22, 1993, NMG, NMG's stockholders, and WCP executed an agreement for the purchase of all the issued and outstanding stock of NMG at a stated purchase price of $31 million allocated among the shares of stock and the warrants. WCP acquired all the issued and outstanding stock of NMG and all the issued and outstanding warrants to purchase NMG stock in a transaction that was closed on December 22, 1993. Pursuant to this transaction, the holders of the reissued warrants sold those warrants and received the following consideration:

| Warrantholder | Number of Shares | Price Per Share | Total Consideration |
|---|---|---|---|
| Univ. of St. Thomas | 260.00 | $7,598.48 | $1,975,604.80 |
| Marquette Univ. | 130.00 | 7,598.48 | 987,802.40 |
| Mayo Foundation | 190.00 | 7,598.48 | 1,443,711.20 |
| Archdiocese | 190.00 | 7,598.48 | 1,443,711.20 |
| Arbeit | 2.14 | 7,598.48 | 16,260.75 |

Each of the donees filed a Form 8282, Donee Information Return, with its Federal income tax return for 1993, in which each reported November 12, 1993, as the date it received its

warrant.  The Forms 8282 filed by the University of St. Thomas, Marquette University, and the Mayo Foundation report a sale of their warrants on December 22, 1993.  The Form 8282 filed by the Archdiocese reports a sale of its warrant on November 19, 1993.

Petitioners did not report any gain from the sale of the warrants by the donees on their Federal income tax return for 1993.  On November 18, 1999, respondent issued a notice of deficiency in which he determined that "the donation of N.M.G., Inc. stock, was an anticipatory assignment of income, resulting in an increase in capital gains of $4,722,484 in 1993."

## Discussion[3]

### A. Motion for Partial Summary Judgment

This matter arises in the context of petitioners' motion for partial summary judgment.  Summary judgment is designed to expedite litigation and to avoid unnecessary and expensive trials.  Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974).  We shall grant a motion for partial summary judgment where there is

---

[3]The parties agree that this case is appealable to the Court of Appeals for the Eleventh Circuit.  Binding precedent in the Eleventh Circuit includes decisions of the Court of Appeals for the Fifth Circuit filed before Oct. 1, 1981.  Shepherd v. Commissioner, 283 F.3d 1258, 1262 n.6 (11th Cir. 2002), affg. 115 T.C. 376 (2000); Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981).  We follow a decision of the Court of Appeals to which an appeal from our disposition of a case lies so long as that decision is squarely in point and a failure to follow that decision would result in an inevitable reversal.  Lardas v. Commissioner, 99 T.C. 490, 494-495 (1992); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

no genuine issue as to any material fact relevant to the issues involved. Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002). The moving party has the burden of proving that no genuine issue of material fact exists and that party is entitled to judgment as a matter of law. FPL Group, Inc. & Subs. v. Commissioner, 116 T.C. 73, 74-75 (2001). In all cases, the evidence must be viewed in the light most favorable to the nonmoving party. Bond v. Commissioner, 100 T.C. 32, 36 (1993). A partial summary adjudication may be made even though all the issues are not disposed of. Rule 121(b); Turner Broad. Sys., Inc. & Subs. v. Commissioner, 111 T.C. 315, 323-324 (1998).

B. Charitable Contributions of Appreciated Property

This case involves a charitable gift of appreciated property; namely, warrants to purchase stock at a set price.[4] It is well established that "A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property

---

[4]Charitable contributions of appreciated property typically give rise to a deduction equal to its fair market value; however, the deduction for capital gain property is generally limited to 30 percent of the taxpayer's adjusted gross income. Sec. 170(a)(1), (b)(1)(C)(i), (F); sec. 1.170A-1(c)(1), Income Tax Regs. On their Form 1040, U.S. Individual Income Tax Return, for 1993, petitioners claimed a charitable deduction of $5,304,530 in accordance with a valuation report they submitted with their return. Respondent raises as an amendment to his answer an issue regarding the correct amount of the charitable deduction that petitioners claimed for 1993. Petitioners concede that issue cannot be decided on a summary judgment motion.

gives rise to income by way of a sale." Humacid Co. v. Commissioner, 42 T.C. 894, 913 (1964); see also Carrington v. Commissioner, 476 F.2d 704, 708 (5th Cir. 1973), affg. T.C. Memo. 1971-222; Campbell v. Prothro, 209 F.2d 331 (5th Cir. 1954). However, it is equally well established that the incidence of taxation depends on the substance rather than the form of a transaction. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Crenshaw v. United States, 450 F.2d 472, 475 (5th Cir. 1971). To that end, the Commissioner has used a number of doctrines as a basis for recharacterizing a purported gift of appreciated property, including the anticipatory assignment of income doctrine, e.g., Ferguson v. Commissioner, 108 T.C. 244 (1997), affd. 174 F.3d 997 (9th Cir. 1999), the step transaction doctrine, e.g., Blake v. Commissioner, T.C. Memo. 1981-579, affd. 697 F.2d 473 (2d Cir. 1982), and the sham transaction doctrine, e.g., Caruth Corp. v. United States, 865 F.2d 644 (5th Cir. 1989). He invokes the anticipatory assignment of income doctrine as the basis for his recharacterizing the purported gifts of stock warrants in this case.

  1. Anticipatory Assignment of Income Doctrine

The general principles underlying the assignment of income doctrine are well established. It taxes income "to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid." Helvering v. Horst, 311 U.S. 112, 119

(1940).  Further, "the mere assignment of the right to receive income is not enough to insulate the assignor from income tax liability" where "the assignor actually earns the income or is otherwise the source of the right to receive and enjoy the income".  Commissioner v. Sunnen, 333 U.S. 591, 604 (1948).  A person cannot escape taxation by anticipatory assignments, however skillfully devised, where the right to receive income has vested.  Harrison v. Schaffner, 312 U.S. 579, 582 (1941).  A mere transfer which is in form a gift of appreciated property may be disregarded for tax purposes if its substance is an assignment of a right to income.  See Palmer v. Commissioner, 62 T.C. 684, 692 (1974), affd. on other grounds 523 F.2d 1308 (8th Cir. 1975).  However, the precise contours of the anticipatory assignment of income doctrine in the context of charitable contributions of appreciated property have been the subject of some contention.

In Palmer, the taxpayer exercised effective control over both a corporation and a tax-exempt foundation that he had organized.  The taxpayer sought to transfer a certain asset, a college, from the corporation to the foundation in a way that would enable the taxpayer to maintain control over the direction and operation of the college and that would yield the most favorable tax consequences.  To that end, the taxpayer caused the foundation to acquire certain shares of stock in the corporation which were held by a trust in which he was a trustee and income

beneficiary.  The taxpayer then transferred shares of stock that he owned directly to the foundation so that it held 80 percent of the issued and outstanding shares of the corporation.  Finally, the board of directors and the shareholders of the corporation approved the redemption of the foundation's stock in exchange for the operating assets of the college.

The Commissioner argued that there was an anticipatory assignment of the proceeds of the redemption.  We disagreed and held that neither the anticipatory assignment of income doctrine nor the step transaction doctrine was applicable.  Id. at 693. We noted that "Even though the donor anticipated or was aware that the redemption was imminent, the presence of an actual gift and the absence of an obligation to have the stock redeemed have been sufficient to give such gifts independent significance." Id. (citing Carrington v. Commissioner, supra; DeWitt v. United States, 503 F.2d 1406 (Ct. Cl. 1974); and Sheppard v. United States, 176 Ct. Cl. 244, 361 F.2d 972 (1966)).  We held:

> When the foundation received the gift of stock from the petitioner, no vote for the redemption had yet been taken.  Although we recognize that the vote was anticipated, nonetheless, under the Hudspeth reasoning, that expectation is not enough.  We have found that the foundation was not a sham, was not an alter ego of the petitioner, and that it received his entire interest in the 238 shares of the corporation stock.  On the same day, it acquired enough shares of stock from the trust to hold in the aggregate 80 percent of the outstanding shares of the corporation.  Thereafter, the foundation voted for the redemption.  It did so because the redemption was in its interest.  At the time of the gift, that vote had not yet been taken, and by the

afternoon of August 31, 1966, the foundation had the voting power to prevent the redemption, if it wished to do so.  In these circumstances, at the time of the gift, the redemption had not proceeded far enough along for us to conclude that the foundation was powerless to reverse the plans of the petitioner.  In light of the presence of an actual, valid gift and because the foundation was not a sham, we hold that the gift of stock was not in substance a gift of the proceeds of redemption.  [Id. at 695.]

The Internal Revenue Service (IRS), in Rev. Rul. 78-197, 1978-1 C.B. 83, acquiesced to our decision in Palmer v. Commissioner, supra, and in doing so devised a "bright-line" test which focuses on the donee's control over the disposition of the appreciated property.  Rev. Rul. 78-197, 1978-1 C.B. at 83, states:

> In Palmer v. Commissioner, 62 T.C. 684 (1974), aff'd on another issue, 523 F.2d 1308 (8th Cir. 1975), the United States Tax Court held that the Internal Revenue Service incorrectly treated a gift of stock to an organization exempt from income taxation pursuant to section 511(c)(3) of the Internal Revenue Code of 1954, followed by a prearranged redemption of the stock, as a redemption of the stock from the donor followed by a gift of the redemption proceeds to the donee. The Service will follow Palmer on this issue, acq., page 6, this Bulletin.

> In Palmer, the taxpayer had voting control of both a corporation and a tax-exempt private foundation. Pursuant to a single plan, the taxpayer donated shares of the corporation's stock to the foundation and then caused the corporation to redeem the stock from the foundation. It was the position of the Service that the substance of the transaction was a redemption of the stock from the taxpayer, taxable under section 301 of the Code, followed by a gift of the redemption proceeds by the taxpayer to the foundation. The United States Tax Court rejected this argument and treated the transaction according to its form because the foundation was not a sham, the transfer of stock to the

foundation was a valid gift, and the foundation was not bound to go through with the redemption at the time it received title to the shares.

Also see, Grove v. Commissioner, 490 F.2d 241 (2nd Cir. 1973); Behrend v. United States, No. 72-1153, 72-1156 (4th Cir. 1972); and Carrington v. Commissioner, 467 [sic] F.2d 704 (5th Cir. 1973).

The Service will treat the proceeds of a redemption of stock under facts similar to those in Palmer as income to the donor only if the donee is legally bound, or can be compelled by the corporation, to surrender the shares for redemption.

In Carborundum Co. v. Commissioner, 74 T.C. 730 (1980), S.C. Johnson & Son, Inc. v. Commissioner, 63 T.C. 778 (1975), and Palmer v. Commissioner, supra, we considered the donees' control over the course of disposition and the donees' ability to reverse a set course of disposition as significant factors in deciding that the donors were not taxable on the donees' subsequent receipt of proceeds.[5] However, we have indicated our reluctance to elevate the question of donee control to a talisman for resolving anticipatory assignment of income issues. For example, in Allen v. Commissioner, 66 T.C. 340, 347-348 (1976), we stated that the donee's power to reverse the donor's anticipated course of disposition was "only one factor to be considered in

---

[5]See also Hudspeth v. United States, 471 F.2d 275, 279 (8th Cir. 1972) (finding significant that "the donees here were powerless to vitiate taxpayer's manifest intent to liquidate or provide them with the corporation's assets through redemption"); Kinsey v. Commissioner, 58 T.C. 259, 264 (1972), affd. 477 F.2d 1058 (2d Cir. 1973) (wherein we found significant the fact that "the donee was powerless, both legally and as a practical matter, to change the course of events already unfolding").

ascertaining the 'realities and substance' of the transaction."
Cf. <u>Jones v. United States</u>, 531 F.2d 1343, 1346 (6th Cir. 1976).
In a more recent opinion, we further extrapolated our position as
follows:

> In determining the reality and substance of a transfer,
> the ability, or the lack thereof, of the transferee to
> alter a prearranged course of disposition with respect
> to the transferred property provides cogent evidence of
> whether there existed a fixed right to income at the
> time of transfer.  Although control over the
> disposition of the transferred property is significant
> to the assignment of income analysis, the ultimate
> question is whether the transferor, considering the
> reality and substance of all the circumstances, had a
> fixed right to income in the property at the time of
> transfer.  [<u>Ferguson v. Commissioner</u>, 108 T.C. at 259;
> citations omitted.]

This Court has not adopted the "bright-line" test stated in
Rev. Rul. 78-197, <u>supra</u>, as the test for resolving anticipatory
assignment of income issues, and instead we have considered the
donee's control to be merely a factor, albeit an important
factor.  For example, in <u>Estate of Applestein v. Commissioner</u>, 80
T.C. 331 (1983), the taxpayer transferred to custodial accounts
for his children stock in a corporation that had entered into a
merger agreement with another corporation.  The merger agreement
was approved by the shareholders of both corporations before the
transfer.  Although the transfer occurred before the effective
date of the merger, this Court held that the "right to the merger
proceeds had virtually ripened prior to the transfer and that the
transfer of the stock constituted a transfer of the merger

proceeds rather than an interest in a viable corporation." Id. at 346; see also Greene v. United States, 13 F.3d 577, 581 (2d Cir. 1994); Jones v. United States, supra at 1346; S.C. Johnson & Son, Inc. v. Commissioner, supra at 786.

2. Arguments of the Parties

Petitioners filed a motion for partial summary judgment and argue that they are entitled to judgment as a matter of law on the issue of whether they must account for the gains realized on the sales of the assigned warrants. Petitioners rely on Carrington v. Commissioner, 476 F.2d 704 (5th Cir. 1973),[6] and Rev. Rul. 78-197, supra, and they argue that where the donees are

---

[6]In Carrington v. Commissioner, 476 F.2d 704 (5th Cir. 1973), affg. T.C. Memo. 1971-222, the taxpayer was the sole shareholder in a corporation that was, in turn, a partner in a partnership. The taxpayer also belonged to a church that was interested in acquiring a rectory. The partnership owned a residence which was suitable for a rectory, and, accordingly, the taxpayer initiated a series of transactions for the purpose of placing that residence into the hands of the church "at the maximum tax benefit" to the taxpayer: (1) The taxpayer transferred 51 of the 100 outstanding shares in the corporation's stock to the church; (2) the partnership then conveyed the residence to the corporation; and (3) the corporation conveyed the residence to the church in redemption of the church's 51 shares. The Commissioner applied the step transaction doctrine, treated the taxpayer as receiving the residence in redemption of his stock and then transferring the residence to the church, and determined that the taxpayer realized dividend income. Both this Court and the Court of Appeals for the Fifth Circuit refused to ignore the "gift step" and held that the taxpayer did not realize an actual or constructive dividend on the redemption of the 51 shares. The Court of Appeals stressed that the church had full title and full dominion and control over the contributed stock, and it was under no prior obligation to redeem its shares. Id. at 709.

not legally bound and cannot be compelled to sell the contributed property, the anticipatory assignment of income doctrine does not apply.

Respondent argues that petitioners are not entitled to judgment as a matter of law and that genuine issues of material fact remain for trial. Respondent argues that the question whether the donees were bound or could be legally compelled to surrender their NMG warrants is not "the critical issue" to be resolved and, accordingly, neither Carrington v. Commissioner, supra, nor Rev. Rul. 78-197, supra, controls this case. It is respondent's position that "the critical issue" in this case is "a factual one": whether petitioners' rights to receive the proceeds of the stock transaction involving WCP "ripened to a practical certainty" at the time of the assignments. Respondent relies on Ferguson v. Commissioner, 174 F.3d 997 (9th Cir. 1999), Jones v. United States, supra, Kinsey v. Commissioner, 477 F.2d 1058 (2d Cir. 1973), affg. 58 T.C. 259 (1972), Hudspeth v. United States, 471 F.2d 275 (8th Cir. 1972), and Estate of Applestein v. Commissioner, supra.

Respondent purports to distinguish both Carrington and Rev. Rul. 78-197, supra, on the facts of the case and the ruling. To that end, he contends that Carrington and Rev. Rul. 78-197, supra, are not inconsistent with the cases he relies upon above. Respondent claims that in this case, and the cases upon which he

relies, there was a pending "global" transaction for the purchase and sale of all the stock of a corporation at the time of the gift or transfer at issue.  He then surmises that because Carrington and Rev. Rul. 78-197, supra, did not involve a pending "global" transaction, the legal principles of those authorities do not apply.  Instead, he argues that we must apply the principles of the cases he relies upon, and, accordingly, we must conduct a detailed factual inquiry for purposes of determining whether the sale of the stock warrants had ripened to a practical certainty at the time of the assignments.

We cannot agree that respondent has effectively distinguished Carrington and Rev. Rul. 78-197, supra, on their facts.  First, neither this Court nor the Courts of Appeals have adopted respondent's theory of a pending "global" transaction as a means of distinguishing cases such as Carrington and Palmer v. Commissioner, 62 T.C. 684 (1974).  Indeed, the caselaw in this area applies essentially the same anticipatory assignment of income principles to cases of a "global" nature as those applicable to cases of a "nonglobal" nature.  See, e.g., Greene v. United States, supra at 581.  We can only interpret respondent's use of the phrase "pending global transaction" as simply a restatement of the principles contained in the cases upon which he relies.  Thus, we cannot agree that respondent's reliance on a pending global transaction distinguishes either

Carrington, Rev. Rul. 78-197, supra, or other cases upon which petitioners rely. With that being said and leaving Carrington and those other cases aside at this point, the bright-line test of Rev. Rul. 78-197, supra, which focuses solely on the donee's control over the contributed property, stands in stark contrast to the legal test and the cases upon which respondent relies and which consider the donee's control to be only a factor.

We are convinced that respondent, in this case, is arguing against the principles which he states in Rev. Rul. 78-197, supra. In his memorandum in opposition to petitioners' motion for partial summary judgment at 30, respondent argues:

> c. Revenue Ruling 78-197, 1978-1 C.B. 83, is not controlling in this case.
>
> Revenue rulings are not binding on respondent or the courts. Stubbs, Overbeck & Assoc., Inc. v. U.S., 445 F.2d 1142, 1147 (5th Cir. 1971). Moreover, Rev. Rul. 78-197, 1978-1 C.B. 83, is not controlling in this case for the very same reasons, stated above, that Carrington v. Commissioner is not controlling. Indeed, in Blake v. Commissioner, 697 F.2d at 480-481, the Second Circuit found that Rev. Rul. 78-197 does not apply to circumstances such as those in the present case, stating:
>
>> More troublesome is the case of Palmer v. Commissioner, 62 TC 684 (1974), aff'd on other grounds, 523 F.2d 1308 (8th Cir. 1975), which held that even an expectation of a stock redemption would not warrant denying charitable contribution status. The Service, in Revenue Ruling 78-197, 1978-1, C.B. 83, acquiesced in Palmer, stating that it would treat redemption proceeds under facts similar to Palmer as income to the donor "only if the donee is legally bound or can be compelled by the corporation, to surrender the shares for redemption." Id. The Service cited

> both Grove and Carrington as support for its position; what we have said above indicates our belief that this Ruling reads too much into those decisions. Where there is, as here, an expectation on the part of the donor that is reasonable, with an advance understanding that the donee charity will purchase the asset with the proceeds of the donated stock, the transaction will be looked at as a unitary one. A wooden view that would require legal enforceability of an understanding or obligation to purchase the asset contemplated to be donated ab initio is not what the tax law contemplates. At least, this circuit will not take it to do so. Judgment affirmed.

Respondent's quotation from the Blake[7] opinion makes his position patently clear. Respondent is disavowing Rev. Rul. 78-197, supra, in this case. When respondent's arguments are boiled down to their essential elements, he argues against the validity of the bright-line test of Rev. Rul. 78-197, supra.

The Commissioner has neither revoked nor modified Rev. Rul. 78-197, supra, in response to the comments in Blake. Indeed, the Commissioner has continued to rely on Rev. Rul. 78-197, supra, in issuing his private letter rulings. See, e.g., Priv. Ltr. Rul.

---

[7]The Court of Appeals for the Second Circuit in Blake v. Commissioner, 697 F.2d 473 (2d Cir. 1982), affirmed our decision in T.C. Memo. 1981-579. The above quotation from Blake could be characterized as dictum. In our Memorandum Opinion, we did not discuss Rev. Rul. 78-197, 1978-1 C.B. 83. Instead, we decided, and the Court of Appeals agreed, that there was a legally enforceable obligation on the part of the donee to purchase a yacht from the donor with the proceeds of a sale of transferred stock. We held that a gift of the stock had not been made to the donee.

2002-30-004 (July 26, 2002).[8]  Moreover, the Commissioner has in a private letter ruling dismissed the statements made in <u>Blake v. Commissioner</u>, <u>supra</u> at 480-481, as "dicta", and stated that "Rev. Rul. 78-197 remains in effect, however" despite the statements made in that case.  See Priv. Ltr. Rul. 1994-13-020 (Apr. 1, 1994), which states in relevant part:

> In Rev. Rul. 78-197, 1978-1 C.B. 83, the Internal Revenue Service announced that it will treat the proceeds of a redemption of stock under facts similar to those in <u>Palmer v. Commissioner</u>, 62 T.C. 684 (1974), acq. on this issue 1978-2 C.B. 2, <u>aff'd</u> on another issue, 523 F.2d 1308 (8th Cir. 1976), as income to the donor only if the donee is legally bound or can be compelled by the corporation to surrender the shares for redemption.  In <u>Palmer</u> the taxpayer-donor had voting control of both a corporation and a tax-exempt private foundation.  Pursuant to a single plan, the taxpayer donated shares of the corporation to the foundation and then caused the corporation to redeem the stock from the foundation.
>
> In <u>Blake v. Commissioner</u>, 697 F.2d 473 (2nd Cir. 1982), the court, in dicta, questioned the Service's acquiescence in <u>Palmer</u> in Rev. Rul. 78-197, suggesting that a mere understanding between the contributing shareholder and the charity concerning the fact that the contributed stock would be redeemed should be enough to treat the shareholder as having received redemption proceeds.  Rev. Rul. 78-197 remains in effect, however.
>
> Although in the case at hand there is some expectation that C will sell the farm items at such

---

[8]Private letter rulings may be cited to show the practice of the Commissioner.  See <u>Rowan Cos., Inc. v. United States</u>, 452 U.S. 247, 261 n.17 (1981); <u>Hanover Bank v. Commissioner</u>, 369 U.S. 672, 686-687 (1962); <u>Estate of Cristofani v. Commissioner</u>, 97 T.C. 74, 84 n.5 (1991); <u>Woods Inv. Co. v. Commissioner</u>, 85 T.C. 274, 281 n.15 (1985); <u>Thurman v. Commissioner</u>, T.C. Memo. 1998-233.

time as their value can be realized, C will be under no
legally binding obligation to do so at the time the
farm items are transferred to the unitrust.  Thus,
based upon the representations made and the principle
enunciated in the authorities cited above, A will not
recognize any income on a sale by the unitrust of farm
items that he has transferred to it.

Although we do not question the validity of the opinions of

this Court and the Courts of Appeals upon which respondent

relies,[9] we are not prepared to allow respondent's counsel to

---

[9]It appears that the result we reached in Ferguson v.
Commissioner, 108 T.C. 244 (1997), affd. 174 F.3d 997 (9th Cir.
1999), is consistent with the result that would have been
obtained under Rev. Rul. 78-197, 1978-1 C.B. 83, because in
Ferguson, we found that the donee could have been compelled to
surrender the stock at the time of the gift.  In Ferguson v.
Commissioner, supra at 263, we stated:

> We believe, instead, that when more than 50 percent of
> the outstanding shares of AHC stock had been tendered
> or guaranteed, which in effect was an approval of the
> merger agreement, and the charities could not vitiate
> the intention of the shareholders who had tendered or
> guaranteed a majority of AHC stock, of petitioners, and
> of DC Acquisition and CDI, the right to merger proceeds
> matured.  * * *

Likewise, in the other cases upon which respondent relies, the
donees were powerless, at the time of the gifts, to reverse the
courses of disposition set by the donors or third parties.  See
Jones v. United States, 531 F.2d 1343 (6th Cir. 1976)
(contribution of 10-percent stock interest in corporation whose
shareholders had overwhelmingly approved a plan of complete
liquidation); Hudspeth v. United States, 471 F.2d at 279
(taxpayer's retained control over corporation rendered donees
with minority interest powerless to vitiate the taxpayer's
"manifest intent to liquidate"); Estate of Applestein v.
Commissioner, 80 T.C. 331 (1983) (bargain sale of 3-percent stock
interest in corporation following approval of merger plan by
shareholders); Kinsey v. Commissioner, 58 T.C. at 266 (charitable
donee with 56-percent majority interest did not have the legal
power to stop a complete liquidation).  Unlike the donees in
(continued...)

argue the legal principles of those opinions against the principles and public guidance articulated in the Commissioner's currently outstanding revenue rulings.

We agree with respondent that revenue rulings are not binding on this Court, or other Federal courts for that matter. See <u>Frazier v. Commissioner</u>, 111 T.C. 243, 248 (1998); <u>N. Ind. Pub. Serv. Co. v. Commissioner</u>, 105 T.C. 341, 350 (1995), affd. 115 F.3d 506 (7th Cir. 1997). However, we cannot agree that the Commissioner is not bound to follow his revenue rulings in Tax Court proceedings. Indeed, we have on several occasions treated revenue rulings as concessions by the Commissioner where those rulings are relevant to our disposition of the case. <u>Walker v. Commissioner</u>, 101 T.C. 537, 550-551 (1993); <u>Burleson v. Commissioner</u>, T.C. Memo. 1994-364.[10] In <u>Phillips v.</u>

---

[9](...continued) those cases, the donees in the instant case had the legal power, at the time of the assignments, to decide not to sell their stock warrants to NMG or WCP.

[10]Other cases where we have treated revenue rulings as concessions by the Commissioner include: <u>Nissho Iwai Am. Corp. v. Commissioner</u>, 89 T.C. 765 (1987); <u>Cascade Designs, Inc. v. Commissioner</u>, T.C. Memo. 2000-58; <u>Merritt v. Commissioner</u>, T.C. Memo. 1995-44; <u>Stalcup v. Commissioner</u>, T.C. Memo. 1995-43; <u>Nikkila v. Commissioner</u>, T.C. Memo. 1993-628; <u>Boice v. Commissioner</u>, T.C. Memo. 1993-627; <u>Callison v. Commissioner</u>, T.C. Memo. 1993-626; <u>Zuhone v. Commissioner</u>, T.C. Memo. 1988-142, affd. 883 F.2d 1317 (7th Cir. 1989).

Commissioner, 88 T.C. 529 (1987),[11] a Court-reviewed opinion, we

stated:

> Respondent's position in this case directly
> contradicted his long-standing and clearly articulated
> administrative position as set forth in Rev. Rul. 72-
> 539, 1972-2 C.B. 634, and reiterated in Rev. Rul. 83-
> 183, 1983-2 C.B. 220.  Respondent's counsel may not
> choose to litigate against the officially published
> rulings of the Commissioner without first withdrawing
> or modifying those rulings.  The result of contrary
> action is capricious application of the law.  * * *
> [Phillips v. Commissioner, 88 T.C. at 534; citation
> omitted.]

Respondent cites Stubbs, Overbeck & Associates, Inc. v.

United States, 445 F.2d 1142 (5th Cir. 1971), which states:  "A

ruling is merely the opinion of a lawyer in the agency and must

be accepted as such.  It may be helpful in interpreting a

statute, but it is not binding on the Secretary or the courts."

Id. at 1146-1147.  However, the Court of Appeals for the Fifth

Circuit made those statements in the context of its rejection of

the Government's argument that a revenue ruling should have "the

force and effect of law."  Id. at 1146.  Given the circumstances

of that case, we construe the statement in Stubbs that the

---

[11]Our decision in Phillips v. Commissioner, 88 T.C. 529
(1987), involving an award of litigation costs under sec. 7430,
was subsequently reversed by the Court of Appeals for the
District of Columbia Circuit, 851 F.2d 1492 (1988).  However,
that reversal was not a result of the statements quoted above.
Instead, the Court of Appeals found the Commissioner's reliance
on our prior decision in Durovic v. Commissioner, 54 T.C. 1364
(1970), affd. in part, revd. in part, and remanded 487 F.2d 36
(7th Cir. 1973), to be "substantially justified" under sec. 7430.
Phillips v. Commissioner, 851 F.2d at 1499.

Secretary is not bound by his revenue rulings to be dictum.
Indeed, the Court of Appeals for the Fifth Circuit, without
mentioning Stubbs, subsequently rejected an argument by the
Commissioner that he was not bound by his revenue rulings.
Estate of McLendon v. Commissioner, 135 F.3d 1017 (5th Cir.
1998), revg. T.C. Memo. 1996-307; see also Silco, Inc. v. United
States, 779 F.2d 282 (5th Cir. 1986).  The Court of Appeals, in
Estate of McLendon v. Commissioner, supra at 1024-1025, stated:

> Most questions of deference to a revenue ruling involve
> an argument by the taxpayer that a particular ruling is
> contrary to law.  Here, however, the argument to ignore
> or minimize the effect of Rev. Rul. 80-80 comes from
> the Commissioner, the very party who issued the ruling
> in the first place.  In such a situation, this circuit
> has a well established rule that is sufficient to
> resolve this case without probing the penumbrae of the
> general deference question.  [Fn. ref. omitted.]

> *    *    *    *    *    *    *

> Silco stands for the proposition that the
> Commissioner will be held to his published rulings in
> areas where the law is unclear, and may not depart from
> them in individual cases.  Furthermore, under Silco the
> Commissioner may not retroactively abrogate a ruling in
> an unclear area with respect to any taxpayer who has
> relied on it.  [Fn. ref. omitted.]

> Applying Silco to this case, it quickly becomes
> clear that Rev. Rul. 80-80 must govern our decision.
> McLendon went to great lengths to structure his
> transaction to comply with applicable law, and the
> Commissioner does not dispute that in so doing McLendon
> expressly relied on Rev. Rul. 80-80's clarification of
> the admittedly murky area of future and dependent
> interest valuation.  The Commissioner ignored the clear
> language of his own ruling in declaring deficiencies,
> and it is precisely this kind of tactic that Silco
> declares to be intolerable.  * * *  [Fn. ref. omitted.]

While this Court may not be bound by the Commissioner's revenue rulings, and in the appropriate case we could disregard a ruling or rulings as inconsistent with our interpretation of the law, see Stark v. Commissioner, 86 T.C. 243, 251 (1986), in this case it is respondent who argues against the principles stated in his ruling and in favor of our previous pronouncements on this issue. The Commissioner's revenue ruling has been in existence for nearly 25 years, and it has not been revoked or modified. No doubt taxpayers have referred to that ruling in planning their charitable contributions, and, indeed, petitioners submit that they relied upon that ruling in planning the charitable contributions at issue. Under the circumstances of this case, we treat the Commissioner's position in Rev. Rul. 78-197, 1978-1 C.B. 83, as a concession. Accordingly, our decision is limited to the question whether the charitable donees were legally obligated or could be compelled to sell the stock warrants at the time of the assignments.[12]

---

[12]Respondent does not contend that Rev. Rul. 78-197, 1978-1 C.B. 83, is limited to cases involving redemptions. Indeed, the Commissioner has applied this ruling to factual scenarios which do not involve stock redemptions. For example, in Priv. Ltr. Rul. 94-13-020 (Apr. 1, 1994), the Commissioner applied the ruling favorably to a gift and subsequent sale of farm items by the trustee of a charitable remainder unitrust. We find that there is no difference in principle in the application of the revenue ruling, between a redemption of stock by a corporation and a sale of stock or stock warrants to an acquiring corporation.

3. Valid Inter Vivos Gift

The requirements of a valid inter vivos gift must be met if the purported gift is to qualify as a charitable contribution under section 170(a). Ferguson v. Commissioner, 108 T.C. at 254; Guest v. Commissioner, 77 T.C. 9, 15-16 (1981).[13] Generally, the delivery of a gift of stock is "complete upon relinquishment of dominion and control of the stock by the donor, which [occurs] upon actual transfer on the books of the issuing corporation." Ferguson v. Commissioner, 108 T.C. at 255; see also Londen v. Commissioner, 45 T.C. 106, 110 (1965); sec. 1.170A-1(b), Income Tax Regs.

There is no dispute regarding whether petitioners made a completed gift, at least in form, of their warrants to purchase NMG stock. With respect to the timing of that gift, the parties stipulated that "On November 9, 1993, Arbeit executed an assignment of rights under the Arbeit NMG Warrant for the purchase of 772.14 shares of NMG class A common stock to four organizations", that counsel for NMG mailed each of the donees a

---

[13]The elements of an inter vivos gift are: (1) Delivery, (2) intention to make a gift on the part of the donor, and (3) absolute disposition by him of the thing which he intends to give to another. Oehler v. Falstrom, 142 N.W.2d 581, 585 (Minn. 1966); see also Carrington v. Commissioner, 476 F.2d at 709 ("A gift of stock between competent parties requires donative intent, actual delivery, and relinquishment of dominion and control by the donor."); Madison Trust Co. v. Skogstrom, 269 N.W. 249, 250 (Wis. 1936) (elements are: (1) Intention to give; (2) delivery; (3) end of dominion of donor; (4) creation of dominion of donee).

reissued warrant on November 11, 1993, that the donees acknowledged receiving those warrants on November 12, 1993, and that on November 12, 1993, NMG's warrant ledger was changed to reflect the donees as owners of the warrants.  We find that the requisites for completed gifts were met no later than November 12, 1993.  Accordingly, we must decide whether, as of that date, the charitable donees were legally bound, or could be compelled, to sell their stock to NMG or WCP.

4.   Whether the Donees Were Legally Bound or Could Be Compelled To Sell the Stock Warrants

Petitioners argue that as of November 12, 1993, the date the warrants were transferred on the books of NMG, the donees had not entered into any agreement to sell the warrants and could not be compelled by any legal means to transfer the warrants.  Accordingly, they contend that, as a matter of law, there was not an assignment of income.  Petitioners submitted affidavits from representatives of the donees in support of their motion for partial summary judgment.  Each of those affidavits outlines the events which preceded the assignments, each states that the stock warrants were received on November 12, 1993, and each also states that, as of that date, the donees had not entered into agreements to sell the stock warrants.

Respondent questioned the reliability of those affidavits, and he contended that the affidavits were deficient in that they failed to state the personal involvement of the representatives

with respect to petitioners' contributions.  He also asserted that the testimony of those affiants is "unknown", and he questioned whether they were involved in any negotiations or discussions with NMG, WCP, or Arbeit regarding WCP's proposed acquisition of NMG stock and warrants.  Respondent also questioned the affiants' competency "to opine upon, or reach any conclusion as to, what constitutes a binding agreement or whether their respective organizations had indeed entered binding agreements in connection with the transactions at issue."  We do not share respondent's reservations with respect to the affidavits, and we find those affidavits credible.

First, in response to respondent's allegations, petitioners submitted additional affidavits from each of the affiants.  Each of those affidavits states:  (1) The affiants were personally involved with respect to petitioners' contributions; (2) before the donees' execution of the warrant purchase and sale agreement, there were no agreements amongst the donees, Arbeit, Mr. Rauenhorst, or any other person or entity regarding the sale of the warrants; and (3) through November 12, 1993, there were no negotiations or communications between the donees and NMG or parties representing NMG, except for the letters from NMG's legal counsel requesting that the donees sign an Additional Party Signature Page.

Second, respondent relies on nonspecific allegations of an informal agreement or understanding between the donees and NMG, WCP, Mr. Rauenhorst, and/or Arbeit. Summary assertions and conclusory allegations are simply not enough evidence to raise a genuine issue of material fact. Daniels v. Commissioner, T.C. Memo. 1994-591 (citing Lechuga v. S. Pac. Transp. Co., 949 F.2d 790, 798 (5th Cir. 1992)). Also, Rule 121(d) provides:

> When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. * * *

See also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); King v. Commissioner, 87 T.C. 1213, 1217 (1986). Respondent alleges no facts or evidence to substantiate his position, and he has submitted no affidavits in response to the affidavits that petitioners submitted. Instead, he points out that the record lacks information regarding any discussions, deliberations, or negotiations which may have taken place between the donees and the other parties. Respondent has had ample opportunity to investigate the facts surrounding these transactions, and it is clear that respondent could have requested additional information from the individuals involved. See Rule 121(e). He has requested neither additional discovery nor a continuance for purposes of additional discovery. He has not demonstrated to our

satisfaction that the only available method for opposing the statements in the affidavits is through cross-examination at trial.  Further, it is insufficient for the opposing party to argue in the abstract that the legal theory involved in the case encompasses factual questions.  Hibernia Natl. Bank v. Carner, 997 F.2d 94, 98 (5th Cir. 1993); Daniels v. Commissioner, supra. Since petitioners have offered affidavits directly supporting their position on a material issue of fact, and since respondent has failed to counter those affidavits with anything other than unsupported allegations, respondent cannot avoid summary judgment on this issue.  See Greene v. United States, 806 F. Supp. 1165, 1171 (S.D.N.Y. 1992), affd. 13 F.3d 577 (2d Cir. 1994).  Thus, we find that there is no genuine issue of material fact regarding whether the donees entered into a legally binding agreement to sell their stock warrants before, or at the time of, the assignments by petitioners.[14]

---

[14]The record indicates that no agreement was entered into by the donees before Nov. 19, 1993, the date they signed the warrant purchase and sale agreement.  On Nov. 16, 1993, NMG's legal counsel sent letters to each of the donees enclosing a warrant purchase and sale agreement.  Those letters state that pursuant to the warrant purchase and sale agreement, the donees would agree to sell their reissued warrants to WCP and "to abstain from either exercising its Warrant or selling or otherwise transferring it to any other party through Dec. 31, 1993." Certainly, the formality of having the donees enter into the warrant purchase and sale agreements suggests that they had not entered into any binding agreements before Nov. 19, 1993.

In support of respondent's position that the right to sale proceeds had "ripened to a practical certainty" at the time of the contributions, he cites: (1) The September 28, 1993, letter of intent from WCP expressing its intention to purchase all the issued and outstanding stock of NMG; (2) the October 22, 1993, resolution by WCP's board of directors, which authorized its officers to negotiate and enter into the agreement for the purchase of all the issued and outstanding capital stock of NMG; and (3) a valuation report prepared by Houlihan, Lokey, Howard, & Zukin (Houlihan Lokey), which was attached to petitioners' 1993 return and which opined that, as of November 12, 1993, there was little chance the transaction involving WCP would not close on or before December 31, 1993. Those items might be particularly relevant for determining whether the stock warrant purchase ripened to a practical certainty; however, none of those items alone, or in combination, show that the donees were legally bound, or could be compelled, to sell their stock warrants.

The letter of intent merely confirms WCP's "intention * * * to purchase all of the issued and outstanding shares of the capital stock of N.M.G., Inc., * * * from the stockholders of the Company"; however, it was not an offer to purchase those shares as respondent claims. Although the letter of intent outlines the terms and conditions of the proposed purchase and sale of stock, including the aggregate purchase price and the repayment of

outstanding indebtedness of NMG, it was only a proposal, and it

cannot be construed as a legally operative offer for the purchase

of all the issued and outstanding shares of NMG.  To that effect,

the letter of intent states:

> This letter represents general intentions of the
> parties and, except for paragraphs 4, 6 and 7, does not
> purport to be and does not constitute a binding
> agreement among the Buyer, Sellers and the Company, and
> except as set forth in paragraphs 4, 6 and 7, none of
> us will have any legal obligation to any other
> hereunder until and unless the Agreement is executed by
> the Exclusivity Date.

> If you believe the foregoing reflects our
> understanding, please so indicate by signing below.[15]

Further, despite respondent's contentions otherwise, the

individuals from NMG who accepted and agreed to the letter of

intent did not accept an offer for the purchase of their stock

interests.  Those individuals accepted and agreed to the letter

of intent (essentially to those sections dealing with

investigations by WCP, public disclosure, and an exclusivity

period) in their capacities as officers of NMG, and, in the case

of Ewel Grossberg, as chairman of NMG's board of directors.  They

---

[15]As the quoted matter above suggests, there were certain
parts of the letter of intent which constituted legally binding
obligations.  However, those items represented typical
preliminary obligations which might appear in purchase and sale
negotiations.  Par. 4 deals with WCP investigation rights, par. 6
deals with public disclosure of the proposed acquisition, and
par. 7 establishes an exclusivity period in favor of WCP with
respect to the purchase of NMG's stock and prohibits any
distributions to its shareholders or other payments, loans, or
distributions out of the ordinary course of NMG's business.

did not accept as shareholders representing a majority of NMG's issued and outstanding shares. The letter of intent was just that, a letter of intent. It did not bind WCP to purchase the stock and stock warrants, and it did not bind NMG's stockholders and warrantholders to sell their stock and warrants.

Nevertheless, respondent argues that the letter of intent triggered certain provisions of the NMG stock warrants, which, in turn, gave rise to a legally binding obligation to sell on the part of the donees. First, respondent contends that the letter of intent triggered NMG's right of first refusal under the terms of the NMG warrant. We cannot agree that the right of first refusal was triggered by the letter of intent. The right of first refusal arose under the warrant only in the case of a "bona fide offer" for the purchase of warrants which is received by the warrantholder. The letter of intent from WCP was not a bona fide offer for the purchase of the warrants. Further, it was not received by petitioners or the donees[16] but was instead addressed to and accepted by the officers and the chairman of the board of NMG. NMG, in turn, was the party in whose favor the right of

---

[16]Even if we were to assume the letter of intent was a bona fide offer to purchase the warrants, a right of first refusal is generally not triggered until the owner's receipt of an offer and his good-faith decision to accept it. 3 Corbin, Corbin on Contracts, sec. 11.3, at 470-471 (rev. ed. 1996). In this case, neither Arbeit's nor the charitable donees' willingness to enter into a sale agreement with WCP was expressed until after the assignments of the warrants.

refusal applies.  We cannot agree that under those circumstances and in the absence of a bona fide offer to the warrantholders the right of first refusal was triggered.

Respondent also points to a portion of the letter of intent which proposes:  "Buyer will contribute to the capital of the Company the funds necessary to repay the Company's outstanding indebtedness, currently estimated to be $55,000,000."  Respondent contends that since the pending stock acquisition by WCP involved a prepayment of all NMG's subordinated debt, a mandatory call provision contained in the NMG warrants was triggered. Respondent claims that "Accordingly, NMG was free to redeem Arbeit's NMG warrant at any time thereafter, as and if necessary, to facilitate acceptance and/or consummation of WCP's offer."  We cannot agree.  The mandatory call provision was only triggered upon the prepayment or voluntary redemption of the subordinated debt.  Those events did not occur until after the assignment of the warrants.

Respondent notes that the letter of intent was "accepted and agreed" by Ewel Grossberg, Randolph K. Ginsberg, Jim Cooper, and John Woodlock.  He argues that those individuals' acceptance and agreement was significant in that they held approximately 92.62 percent of NMG's outstanding common stock and 100 percent of NMG's outstanding preferred stock as of September 28, 1993, and

that this triggered the antidilution provision of the NMG warrants.[17]  That provision is:

> if a purchase, tender or exchange offer shall have been made to and accepted by the holders of more than 50% of the outstanding shares of Capital Stock, and if the holder of such Warrants so designates in a notice given to the Company, the holder of such Warrants shall be entitled to receive in lieu thereof, the highest amount of securities or other property to which such holder would actually have been entitled as a shareholder if such holder had exercised such Warrants prior to the expiration of such purchase, tender or exchange offer and accepted such offer * * *

However, the letter of intent was not an offer; it was neither a purchase, tender, or exchange offer as the antidilution provision specifies.  Further, Ewel Grossberg, Randolph K. Ginsberg, Jim Cooper, and John Woodlock did not accept and agree to the conditions stated in the letter of intent in their capacities as shareholders of NMG.  Instead, they did so in their capacities as officers of NMG, thus obligating NMG to some of the preliminary matters stated in the letter of intent.  Moreover, the antidilution provisions cannot be construed to legally bind the warrantholders to sell their warrants to NMG or WCP.  Those provisions, on the contrary, protect the warrantholders and give them the option of participating on the same terms as the majority shareholders.

---

[17]Those individuals would continue to hold 68.69 percent of NMG's outstanding capital stock if all outstanding preferred were treated as common shares and all NMG warrants were exercised. Respondent contends that this approach would be consistent with the antidilution provision in the NMG warrants.

Respondent cites WCP's board of directors resolution which directed its officers to negotiate and complete the acquisition of NMG shares. The resolution by WCP's board of directors does not demonstrate that the warrantholders were legally bound, or could be compelled, to sell their stock warrants at the time of the assignments. Although that resolution preceded the assignments of the warrants to the charitable donees, WCP did not complete its acquisition of NMG stock and warrants until after the assignments. WCP did not reach an agreement with the donees herein until November 19, 1993, and they did not finally consummate the transaction until they entered into the stock purchase agreement of November 22, 1993, and closed the transaction on December 22, 1993. Those events occurred after petitioners assigned the warrants. The resolution simply authorizes WCP's officers to negotiate and complete the acquisition. The resolution itself does not affect the rights of the donees in their warrants.

Respondent relies on a correspondence report prepared by Houlihan Lokey, dated January 3, 1994. He relies upon a section of the Houlihan Lokey report entitled "Management Comments On The Transaction", which states: "Management believes that there is very little change [sic] the transaction will not close on or

before December 22, 1993."[18]  Again, this information might be relevant to a determination whether the right to sale proceeds "ripened"; however, nothing in the Houlihan Lokey report suggests that the warrantholders were legally bound, or could be compelled, to sell their warrants to WCP.

Respondent also points to Del. Code Ann. tit. 8, sec. 271 (2001) and argues that the donees could have been compelled to surrender their NMG warrants.  That section provides:

> SEC. 271.  Sale, lease or exchange of assets; consideration; procedure.
>
> (a)  Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets * * * upon such terms and conditions and for such consideration * * * as its board of directors or governing body deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon * * *

---

[18]We note that despite the report's conclusion that there was little chance the transaction involving WCP would not be consummated, Houlihan Lokey took significant discounts for the risk that the transaction would not be completed.  The report reflects that there was a 15- to 25-percent probability that the deal would fall through as of Nov. 12, 1993, and this discount figured into the valuation analysis of the warrants.  Further, although respondent relies significantly on the valuation report with respect to petitioners' motion for partial summary judgment, we point out that respondent essentially takes the position in his amended answer that the valuation report is wrong in assigning a value of $6,889 per warrant and that petitioners' charitable deductions are limited to $424.10 per warrant, or $326,577 in the aggregate.

We might agree that the donees in this case were powerless to prevent the majority shareholders of NMG from selling substantially all the property and assets of NMG. However, we cannot agree that the donees could have been compelled to sell their stock warrants under this provision. The donees' stock warrants were not the property or an asset of NMG. Further, WCP's intentions clearly did not contemplate a direct acquisition of NMG's property and assets.

As petitioners suggest, respondent might have cited other provisions of Delaware's General Corporation Law, including section 251, which deals with the merger of two or more entities into one corporation following a resolution of the board of directors and upon a vote of a majority of the outstanding voting stock, and section 275, which deals with the dissolution of a corporation following a resolution of the board of directors upon a vote of a majority of the outstanding voting stock. However, neither of those situations is present in this case. Neither WCP nor NMG contemplated a merger, liquidation, or dissolution involving those entities. On the contrary, the expressed intentions of WCP contemplate only an acquisition of NMG stock and warrants from the stockholders and warrantholders. In the actual course of events, WCP in fact acquired the stock and warrants in this manner. We are not inclined to posit any hypothetical scenarios which might have occurred wherein the

donees might conceivably have been forced to surrender their stock warrants by merger, liquidation, or dissolution, absent some plan or other corporate action to that effect.

Petitioners submitted affidavits in support of their position regarding a material issue of fact. Respondent makes unsupported and nonspecific allegations in response to the statements in the affidavits. Respondent points to nothing in the record nor does he allege facts which raise a genuine issue of material fact regarding whether the donees were legally bound, or could be compelled, to sell the stock warrants at the time of the assignments by petitioners. Respondent has had ample time for investigation and does not request additional time for discovery. This matter is now ripe for decision, and we hold that petitioners are entitled to judgment as a matter of law on the anticipatory assignment of income issue.

5. Conclusion

Rev. Rul. 78-197, 1978-1 C.B. 83, is contrary to respondent's litigation position in this case. Instead of accepting the legal principles articulated in that ruling, respondent's counsel contends that the Commissioner is not bound by revenue rulings, and his reliance on Blake v. Commissioner, 697 F.2d at 480-481, demonstrates that he is taking the position in this case that the ruling is incorrect.

The Department of the Treasury's statement of procedural

rules, contained in the regulations, provides in relevant part:

(2) <u>Objectives and standards for publication of</u>
<u>Revenue Rulings and Revenue Procedures in the Internal</u>
<u>Revenue Bulletin</u>.--(i)(<u>a</u>) A "Revenue Ruling" is an
official interpretation by the Service that has been
published in the Internal Revenue Bulletin.  Revenue
Rulings are issued only by the National Office and are
published for the information and guidance of
taxpayers, Internal Revenue Service officials, and
others concerned.

\*     \*     \*     \*     \*     \*     \*

(iii)  The purpose of publishing revenue rulings
and revenue procedures in the Internal Revenue Bulletin
is to promote correct and uniform application of the
tax laws by Internal Revenue Service employees and to
assist taxpayers in attaining maximum voluntary
compliance by informing Service personnel and the
public of National Office interpretations of the
internal revenue laws, related statutes, treaties,
regulations, and statements of Service procedures
affecting the rights and duties of taxpayers.  \* \* \*

\*     \*     \*     \*     \*     \*     \*

(v)  \* \* \*

\*     \*     \*     \*     \*     \*     \*

(<u>d</u>)  Revenue Rulings published in the
Bulletin do not have the force and effect of
Treasury Department Regulations (including
Treasury decisions), but are published to provide
precedents to be used in the disposition of other
cases, and may be cited and relied upon for that
purpose.  \* \* \*

(<u>e</u>)  Taxpayers generally may rely upon
Revenue Rulings published in the Bulletin in
determining the tax treatment of their own
transactions and need not request specific rulings

applying the principles of a published Revenue
Ruling to the facts of their particular cases.
* * * [Sec. 601.601(d)(2), Statement of
Procedural Rules.]

Similar statements appear in the introduction section of each volume of the Commissioner's Internal Revenue Bulletin. See, e.g., 1978-1 C.B. at iii. Surely, given these statements, taxpayers should be entitled to rely on revenue rulings in structuring their transactions, and they should not be faced with the daunting prospect of the Commissioner's disavowing his rulings in subsequent litigation.

Recently, the IRS, in a joint statement issued by the Commissioner, the Chief Counsel, and the Acting Assistant Secretary (Tax Policy) of the Department of the Treasury, has indicated its "continuing commitment to serve the public through the published guidance process". Department of the Treasury 2002-2003 Priorities for Tax Regulations and Other Administrative Guidance (July 10, 2002). To that end, the IRS has committed itself "to increased and more timely published guidance", in the form of revenue rulings and revenue procedures, in the hopes of achieving increased taxpayer compliance and resolving "frequently disputed tax issues". These stated goals will not be achieved if the Commissioner refuses to follow his own published guidance and argues in court proceedings that revenue rulings do not bind him or that his rulings are incorrect. Certainly, the Commissioner's failure to follow his own rulings would be unfair to those

taxpayers, such as petitioners herein, who have relied on revenue rulings to structure their transactions.  Moreover, it is highly inequitable to impose penalties, which respondent has done in this case.  Accordingly, in this case, we shall not permit respondent to argue against his revenue ruling, and we shall treat his revenue ruling as a concession.

<u>An appropriate order will be issued granting petitioners' motion for partial summary judgment</u>.