T.C. Memo. 2006-183

UNITED STATES TAX COURT

ESTATE OF ANTHONY J. TAMULIS, DECEASED, WANDA RODGERSON, EXECUTOR
AND TRUSTEE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20721-03.                    Filed August 29, 2006.

<u>Hugh J. Graham III</u>, for petitioner.

<u>Thomas C. Pliske</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency in Federal estate tax of $745,177 for the Estate of Anthony J. Tamulis (the estate).  The sole issue for decision is whether the estate is

entitled to a deduction under section 2055[1] for the remainder interest of the Anthony J. Tamulis Trust (the trust). We hold that the estate is not.

FINDINGS OF FACT

Most of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference.

Anthony J. Tamulis (decedent), a Roman Catholic priest, died testate on November 23, 2000, in Sandwich, Massachusetts.[2] Dennis Carlile was named executor of the estate and trustee of the trust. The estate was administered in Illinois, where Mr. Carlile resided at the time the petition was filed.[3]

Decedent executed a will on February 18, 2000, that was in effect at the time of his death. On the same day, decedent also executed a Third Restatement and Revision of Living Trust Instrument, governing the terms of the trust. The parties have

---

[1] All section references, unless otherwise noted, are to the Internal Revenue Code of 1986, as in effect for the time of decedent's death.

[2] Decedent was a resident of Mt. Olive, Ill., for most of his life, but following a stroke several years before his death had been living in Massachusetts so that he could be cared for by his niece, Wanda Rodgerson.

[3] Mr. Carlile died on Apr. 7, 2005, and Wanda Rodgerson was substituted as executor for the estate and successor trustee for the trust.

stipulated that decedent amended the trust by means of a letter dated February 26, 2000 (discussed _infra_). This Third Restatement and Revision of Living Trust Instrument, as amended by the letter, was in effect at the time of decedent's death. As settlor, decedent directed that the trust be governed by Illinois law.

The will directed that all of decedent's property, after the payment of debts, expenses, and taxes, pass to the trust. The trust's governing instrument provided for specific bequests to various charitable and noncharitable recipients. Following the satisfaction of these specific bequests, the trust's governing instrument provided for annual payments during the term of the trust of specific amounts to several of decedent's relatives, provided certain conditions were met, as well as the transfer of certain real property and payment of the real estate taxes on that property during the lives of its life tenants, with the remainder of the trust's "net income" each year to be divided equally between two of decedent's grandnieces. More specifically, paragraphs 7(B) and (C) of the trust provided that

> B. The trustee is to convey my property at No. 2 Surrey Lane, Sandwich, Massachusetts 02563 with a life estate therein to be held by my brother, John Tamulis and his wife, Mary or the survivor of them, with the remainder therein to my grandniece[s], Erica Rodgerson and Melissa Rodgerson share and share alike.

During the period of the lives of John and Mary Tamulis, the trust shall pay all real estate taxes on said real estate; however, utilities and all other costs shall be borne by the life tenants, yet as supplemented with the contribution from the trust as provided in 7(C)i below.

C. During the term of the trust, the trustee is to pay the following amounts to the following individuals:

i. $5,000 per year to John Tamulis and if he should predecease his wife Mary Tamulis, then $5,000 per year to her, said money is for the purposes of defraying the utilities and cost of repair and maintenance of the house in Sandwich, Massachusetts;

ii. $5,000 per year to Wanda Rodgerson so long as she is making reasonable progress in pursuit of a Ph.D. in education;

iii. $1,000 per year to Erica Rodgerson;

iv. $1,000 per year to Melissa Rodgerson;

v. The trustee is to pay the balance of the trust net income as that is determined in accordance with normal accounting principles to Melissa Rodgerson and Erica Rodgerson, my grandnieces, share and share alike.

The amendment to the trust by letter of February 26, 2000, provided that the trust would pay $10,000 per year to Migle Francaite, another of decedent's grandnieces, "until she graduates from medical school. I gave same to Melissa and Erica." Decedent, as settlor, gave the trustee

authority to act with regard to the trust and the assets making up the trust in all manners consistent with the laws of the States of Illinois and Massachusetts provided, however, the trustee is authorized to sell or exchange shares of stock making up the trust account only upon first

having received the prior written approval of the intended sale from my niece, WANDA RODGERSON.

The trust was to operate for the longer of 10 years or the joint lives of John and Mary Tamulis,[4] and upon termination, the remainder of the trust's assets was to pass to the Roman Catholic Diocese of Fall River, Massachusetts (diocese).

After obtaining an extension for filing, the estate timely filed its Federal estate tax return on November 30, 2001. The estate claimed a charitable contribution deduction of $1,495,526 representing the claimed value of a charitable remainder interest given to the diocese. On Schedule O of the estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, the following statement (return statement) was made:

> Charitable Remainder
> Roman Catholic Diocese of Fall River, Mass.
> Balance that is residue following 10 year term certain charitable remainder unitrust at 5% quarterly payments to two grand nieces Erica and Melissa Rodgerson, where during the term, the Trustee holds and operates pursuant to the terms and conditions of I.R.C. Sec. 664 and related provisions with balance at end of 10 year term to the Roman Catholic Diocese of Fall River, Mass. a 501(c)3 organization See attached calculations of Charitable Remainder Deductible.

---

[4] The estate states on brief that John and Mary Tamulis were in their eighties when the trust was created, although there is no direct evidence of their age in the record.

In each of the years 2001 through 2004, the trust distributed 5 percent of the fair market value of the trust assets, valued as of January 2 of each year, to the trust's beneficiaries.

An examination of the estate's return commenced sometime before February 25, 2002, the date of a letter from respondent to Mr. Carlile seeking additional information in connection with the examination. A notice of deficiency was issued on September 18, 2003, in which respondent determined that the charitable contribution deduction claimed by the estate for the remainder interest should be disallowed because the trust did not satisfy the requirements of section 2055.

During August 2002, certain of the interested parties made various efforts to reform the trust. Mr. Carlile and the diocese each prepared revised versions of the trust's governing instrument, but neither version was ever executed by the trustee or any of the beneficiaries. Mr. Carlile also prepared a draft of a "Complaint for Restatement of Trust" for filing in State court, which was circulated to the beneficiaries but never filed with any court.

In August 2003, Mr. Carlile executed a document, also titled "Third Restatement and Revision of Living Trust Instrument", which by its terms revised the trust's governing instrument (2003 amendment). All of the beneficiaries of the trust, except Migle

Francaite, provided written consent to the 2003 amendment. Under the 2003 amendment, the trustee was required to pay, in the aggregate, 5 percent of the net fair market value of the trust assets each year to the same noncharitable beneficiaries designated in the original instrument, with payment to be allocated among them so as generally to equal the annual payments specified for each in the original instrument, with any remaining balance paid in equal shares to Erica and Melissa Rodgerson.[5]

OPINION

In general, for purposes of determining the estate tax imposed by section 2001, a deduction is allowed from a decedent's gross estate for transfers for public, charitable, or religious uses. Sec. 2055(a). However, this general rule is restricted for so-called split-interest transfers, wherein an interest in property passes from the decedent to a charitable beneficiary while an interest in the same property passes to a noncharitable beneficiary (for less than adequate and full consideration). See sec. 2055(e)(2). Where the interest passing to the charitable beneficiary is a remainder interest, no deduction is allowed unless the interest is in a trust which is a charitable remainder

_____

[5] The 2003 amendment's terms further provided that, in the event 5 percent of the annual fair market value was insufficient to satisfy all of the allocations, the allocated payments would be satisfied according to a designated order until the 5 percent was exhausted.

unitrust (CRUT) or charitable remainder annuity trust (CRAT) (described in section 664), or a pooled income fund (PIF) (described in section 642(c)(5)).  Sec. 2055(e)(2)(A);[6] <u>Estate of Edgar v. Commissioner</u>, 74 T.C. 983, 986 (1980), affd. without published opinion 676 F.2d 685 (3d Cir. 1982).

Congress imposed the section 2055(e)(2)(A) requirement that a CRAT, CRUT, or PIF be used where there is a bequest of a charitable remainder interest to remove the "incentive to favor the income beneficiary over the remainder beneficiary by means of manipulating the trust's investments."  H. Rept. 91-413 (Part 1), at 59 (1969), 1969-3 C.B. 200, 238; S. Rept. 91-552, at 88 (1969), 1969-3 C.B. 423, 480.  It had come to Congress's attention that taxpayers were claiming charitable deductions for bequests of remainder interests in trusts based upon valuation assumptions for the remainder interests that were inconsistent with the manner in which the trusts assets were in fact managed. Where trust assets were invested so as to maximize the income interest, the value eventually passing to charity through the remainder interest might bear little relationship to the deduction previously taken.  Therefore, Congress mandated a trust

---

[6] Sec. 2055(e)(2) was enacted as part of the Tax Reform Act of 1969 (the 1969 Act), Pub. L. 91-172, sec. 201(d)(1), 83 Stat. 560, and its requirements for split interests are often referred to as the "1969 Act rules."

mechanism that set the annual payout to the noncharitable income beneficiaries as a fixed dollar amount (a CRAT) or fixed percentage of the value of the trust assets (a CRUT), thereby minimizing the incentive to skew investment strategy to favor the noncharitable income beneficiaries.[7] Estate of Gillespie v. Commissioner, 75 T.C. 374, 376-378 (1980); H. Rept. 91-413 (Part 1), supra at 58-60, 1969-3 C.B. at 237-238; S. Rept. 91-552, supra at 86-87, 1969-3 C.B. at 479.

To mitigate the reduction in amounts going to charity that the imposition of this stringent framework could engender, Congress provided a statutory mechanism in 1984 by which a trust that failed to satisfy the CRAT, CRUT, or PIF regime of section 2055(e)(2)(A) might nonetheless be modified by means of a "qualified reformation" so that a deduction under section 2055(a) would be allowed. Sec. 2055(e)(3)(A).[8] A "qualified

---

[7] The third option Congress provided, a PIF, is an irrevocable trust in which the property of the trust is managed by the charitable organization to which the remainder interest is contributed and for which the donor retains an income interest for the life of one or more beneficiaries. Sec. 642(c)(5). Since the assets in a PIF are managed by a charitable organization, the incentive to favor the noncharitable income beneficiaries is presumed eliminated.

[8] Sec. 2055(e)(3), enacted by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 1022(a), 98 Stat. 1026, was a permanent rule to replace various temporary reformation provisions that preceded it and is effective for reformations made after Dec. 31, 1978.

reformation" for this purpose "means a change of a governing instrument by reformation, amendment, construction, or otherwise which changes a reformable interest into a qualified interest", subject to certain conditions.  Sec. 2055(e)(3)(B).

A "reformable interest" for this purpose is defined as an interest that would qualify for a deduction under section 2055(a) but for the CRAT, CRUT, or PIF requirement of section 2055(e)(2), sec. 2055(e)(3)(C)(i),[9] but only if all payments to be made to noncharitable beneficiaries before the remainder interest vests are expressed either in "specified dollar amounts" or as a "fixed percentage of the fair market value of the [trust] property", sec. 2055(e)(3)(C)(ii).  The requirement that all such payments be expressed as specified dollar amounts or a fixed percentage of the fair market value of the trust property does not apply, however, "if a judicial proceeding is commenced to change such interest into a qualified interest not later than the 90th day after the last date (including extensions) for filing the estate tax return."  Sec. 2055(e)(3)(C)(iii)(I).

---

[9] The sec. 2055(e)(3)(C)(i) prong is intended to incorporate the requirements of prior law, such as that the charitable remainder interest in a split-interest trust be "ascertainable"; i.e., severable from the noncharitable interest.  H. Rept. 98-432 (Part 2), at 1518 (1984); see also Ithaca Trust Co. v. United States, 279 U.S. 151, 154 (1929); sec. 20.2055-2(a), Estate Tax Regs.

The legislative history of section 2055(e)(3) indicates that Congress intended a more liberal reformation rule for trusts where the creator had made a bona fide attempt to comply with the provisions of the 1969 Act (i.e., the requirements of section 2055(e)(2)), and a more exacting rule (namely, commencement of a judicial proceeding within 90 days after the due date of the estate tax return) for trusts where the creator had not evidenced any intent to comply with the 1969 Act.

> The committee believes that these [reformation] rules will permit the correction of major, obvious defects (such as where the "income" interest is not expressed as an annuity interest or a unitrust interest) so long as the taxpayer initiates reformation proceedings before audit, while allowing the correction of minor defects (such as defects in determining the correct payout in short taxable years, in years of additional contributions, etc.) upon audit so long as there was a good faith attempt to comply with the 1969 Act rules (i.e., the payout is basically expressed as an annuity interest or a unitrust interest). * * * [H. Rept. 98-432 (Part 2), at 1517 (1984); S. Rept. 98-169 (Vol. 1), at 732 (1984).]

Thus, where the payout to the noncharitable beneficiaries has been "basically expressed as an annuity interest or a unitrust interest"--that is, as specified dollar amounts or as a fixed percentage of the fair market value of the trust property, in accordance with section 2055(e)(3)(C)(ii)--then a reformation may be effected even after an audit has commenced.  H. Rept. 98-432 (Part 2), supra at 1517; S. Rept. 98-169 (Vol. 1), supra at 732; see also Estate of Hall v. Commissioner, 93 T.C. 745, 753-754 (1989), affd. without published opinion 941 F.2d 1209 (6th Cir.

1991). But where the payouts have not been expressed in the trust's governing instrument in conformity with section 2055(e)(3)(C)(ii), reformation is permitted only if a judicial proceeding to make the appropriate changes to the trust is commenced within 90 days after the due date of the estate tax return.

The estate has stipulated that the trust, as in effect at the time of decedent's death, did not qualify as either a CRAT or a CRUT.[10] Consequently, the bequest of the remainder interest to the diocese will qualify as a deduction under section 2055(a) only if the remainder interest was a "reformable interest" that underwent a "qualified reformation". Sec. 2055(e)(3).

The remainder interest to the diocese cannot qualify as a "reformable interest" because certain payments to be made to the noncharitable beneficiaries before the remainder vests are not expressed as either a specified dollar amount or a fixed percentage of the fair market value of the trust property, as required by section 2055(e)(3)(C)(ii).[11] The provision for the

---

[10] Similarly, because the trust at issue was not maintained by the diocese, it cannot qualify as a PIF. See sec. 642(c)(5)(E).

[11] Respondent also argues that, because the trust instrument provides for payments to Wanda Rodgerson for "so long as she is making reasonable progress in pursuit of a Ph.D. in education" and to Migle Francaite "until she graduates from medical school", the remainder interest also does not satisfy sec.

(continued...)

payment of the real estate taxes on decedent's Sandwich, Massachusetts, residence is not expressed as a specified dollar amount (or calculable as such) or as a fixed percentage of fair market value; thus, the payment for taxes is not fixed as required under section 2055(e)(3)(C)(ii). More significantly, the provision for payment to Melissa and Erica Rodgerson of the balance of the trust's "net income" (after satisfaction of the payments directed for other noncharitable beneficiaries) is neither a specified dollar amount nor a fixed percentage of fair market value. Indeed, by providing for a payout of net income to a noncharitable beneficiary, the trust's terms would enable the specific abuse to which the 1969 Act rules (i.e., the provisions of section 2055(e)(2)) were addressed; namely, the reduction of the value of the remainder interest actually passing to charity below the amount of the deduction claimed, because of the

---

[11](...continued)
2055(e)(3)(C)(i); i.e., the remainder interest would not be an allowable deduction under pre-1969-Act law because the payments are not "ascertainable". We note that the trust instrument provides, immediately after directing the foregoing payments, that "the balance of the trust net income" is to be paid to two other beneficiaries. This juxtaposition gives rise to a possible interpretation that the payments to Wanda Rodgerson and Migle Francaite are limited to the trust's net income, and the estate makes an argument on similar grounds that the remainder interest was ascertainable. However, we find it unnecessary to decide whether the remainder interest satisfies sec. 2055(e)(3)(C)(i), as the remainder interest's failure to satisfy sec. 2055(e)(3)(C)(ii) precludes a finding that it is a "reformable interest" in any event.

trustee's ability to favor a noncharitable "income" beneficiary through his management of the trust assets during the period before the remainder vests.[12]  See Estate of Gillespie v. Commissioner, 75 T.C. at 376-378; H. Rept. 91-413 (Part 1), supra at 58-60, 1969-3 C.B. at 237-238; S. Rept. 91-552, supra at 86-87, 1969-3 C.B. at 479.

Because the noncharitable beneficiaries' interests were not fixed as required in section 2055(e)(3)(C)(ii), the only remaining option for reformation was commencement of a judicial proceeding to reform the trust within 90 days after the estate's tax return was due.  See sec. 2055(e)(3)(C)(iii).  Since no such proceeding was ever commenced, the estate has failed to satisfy the requirements of section 2055(e)(3)(C)(iii).  As a result, the remainder interest at issue is not a "reformable interest", which precludes any reformation whereby it could meet the requirements for a deduction under section 2055(e)(2).

While this result may seem harsh, the legislative history makes clear that Congress intended a tightly circumscribed reformation rule.  Congress was concerned that an overly liberal rule would permit abuse; namely, that taxpayers would not reform

---

[12] In this regard, we note that although the governing instrument gave the trustee authority to act with respect to the trust assets "in all manners consistent with the laws of the States of Illinois and Massachusetts", the trustee could sell stock held by the trust only upon the approval of Wanda Rodgerson, one of the noncharitable beneficiaries.

trusts to comply with the 1969 Act rules unless and until defects were discovered by the Commissioner upon audit.  The committee reports accompanying Congress's enactment of the reformation provisions of section 2055(e)(3) state as follows:

> Congress first permitted reformation of charitable remainder trusts in 1974 and since that time, the Congress has extended the period for reformations several times * * * .  Even so, it has come to the attention of the committee that there are still many instruments providing for split-interest charitable contributions which do not meet the requirements for qualification under the rules of the Tax Reform Act of 1969.  * * *  In light of the repeated need to extend the period to reform such governing instruments and the fact that failure to meet the 1969 Act rules often results in reduced amounts passing to charity, the committee believes that a permanent rule permitting reformation of split-interest charitable contributions should be permitted as long as there are adequate safeguards to avoid abuse.
>
> Specifically, the committee is concerned that governing instruments of charitable split-interest trusts which evidenced no attempt to comply with the 1969 Act rules would be reformed only if the defects are found upon audit by the Internal Revenue Service. In order to prevent this from occurring, the committee believes that, in order for a governing instrument of a charitable split-interest contribution to be reformable, either (1) the creator had to make a bona fide attempt to comply with the 1969 Act rules or (2) the taxpayer must initiate reformation proceedings before the Internal Revenue Service could reasonably be expected to begin an audit.  * * * [H. Rept. 98-432 (Part 2), supra at 1516-1517; S. Rept. 98-169 (Vol. 1), supra at 731-732.]

The committee reports go on to clarify what constitutes the creator's "bona fide attempt to comply with the 1969 Act rules" (as codified in section 2055(e)(3)(C)(ii)):  "The governing instrument evidences an intent to comply with the 1969 Act rules

if all current payouts from the trust are expressed solely[13] as a fixed dollar amount or a fixed percentage of the value of the trust's assets."  Id. at 1518; S. Rept. 98-169 (Vol. 1), supra at 733.

Congress thus intended reformation to be available only if the "creator" of the trust had made a bona fide attempt to comply with the 1969 Act rules (i.e., the governing instrument as established by the trust's settlor expressed noncharitable payouts solely as fixed dollar amounts or a fixed percentage of the value of the trust's assets) or a judicial proceeding to reform the trust was commenced within 90 days after the return's filing.

The estate cobbles together several arguments in an effort to show that a "qualified reformation" occurred.  The estate argues that the return statement served either to amend the trust into a CRUT or to signify the trustee's intent to operate the trust as a CRUT.  Furthermore, the estate contends, the trust was in fact managed in accordance with the requirements for a CRUT, as the total annual distributions to the noncharitable beneficiaries were equal to 5 percent of the fair market value of the trust's assets in each of the years 2001 through 2004.

---

[13] The excerpts from the House and Senate committee reports are identical, except that the word "solely" does not appear in the House version.

We reject the estate's contention that the return statement amended the trust into a CRUT. Even if we accept the dubious proposition that a statement on a Federal estate tax return could operate to amend a trust created under State law, the return statement nowhere contains the words "amend" or "amendment" or otherwise suggests this purpose in any way. Moreover, there is no evidence that, as of the return's filing, either the charitable or the noncharitable beneficiaries consented to the amendment purportedly manifested on the estate's return, as required by Illinois law.[14]

The estate also contends in the alternative that the return statement was equivalent to the commencement of a judicial

---

[14] Decedent as settlor directed that the trust be governed by Illinois law, and the estate on brief takes the position that Illinois law governs. Illinois law requires the consent of all charitable and noncharitable beneficiaries (whose interests have not expired) before a trustee may amend a charitable trust instrument to bring it into conformity with the CRUT requirements of sec. 664. See 760 Ill. Comp. Stat. Ann. 60/1(2) (West 1992).

Notwithstanding the foregoing provision of Illinois law, the estate argues that the trustee was authorized, acting alone, to amend the trust instrument, citing as authority Rev. Proc. 89-20, 1989-1 C.B. 841. Rev. Proc. 89-20, supra, provides a sample form of a declaration of trust that, if followed by a taxpayer, the Commissioner agrees to treat as satisfying the requirements for a CRUT. The sample form contains a provision authorizing the trustee, acting alone, to amend the trust in any manner required for the sole purpose of ensuring that the trust qualifies as a CRUT. Rev. Proc. 89-20, supra, is conditioned, however, upon a taxpayer's trust's being "a valid trust under applicable local law." We conclude that Rev. Proc. 89-20, supra, is neither intended to, nor does it, abrogate the requirements of Illinois law for amending a charitable trust.

proceeding within the meaning of section 2055(e)(3)(C)(iii), which ultimately culminated in the 2003 amendment that amended the payment terms for the noncharitable beneficiaries so that a qualified interest was created.[15] We disagree. Filing a Federal estate tax return in no way commences a judicial proceeding. The commencement date for a judicial proceeding for purposes of section 2055(e)(3)(C)(iii) has been strictly construed. See Estate of Hall v. Commissioner, 93 T.C. 745 (1989) (State court's nunc pro tunc effective date for trust reformation disregarded in determining date of commencement of judicial proceeding under section 2055(e)(3)(C)(iii)). In sum, the claim that the trust was amended by virtue of the return statement does not withstand scrutiny.

The estate's argument that the section 2055(e)(3) reformation provisions were satisfied because the trust was managed by the trustee in conformance with the requirements of a CRUT, since the payments to noncharitable beneficiaries were in fact equal to 5 percent of the fair market value of the trust's assets, is similarly unavailing. The claim that it should be

---

[15] The 2003 amendment fixed the annual payments to the noncharitable beneficiaries (in the aggregate) at 5 percent of the net fair market value of the trust's assets (allocated among those beneficiaries generally according to the payments specified in the original trust instrument). However, the 2003 amendment was not executed, or consented to by any beneficiaries, until August 2003.

sufficient if a trustee <u>chooses</u> to manage a trust so that the payouts to noncharitable beneficiaries conform to the requirements of a CRUT, even where the governing instrument does not require this result, conflicts with the explicit terms of both the 1969 Act rules, sec. 2055(e)(2), and the reformation provisions of section 2055(e)(3).  Section 2055(e)(2) provides that "no deduction shall be allowed" for the charitable remainder interest in a split-interest trust "unless * * * such interest is in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c)(5))".  Reformation under section 2055(e)(3) is not available unless the governing instrument contains specified terms, sec. 2055(e)(3)(C)(ii), or is promptly amended, sec. 2055(e)(3)(C)(iii).  Thus, in both the "substantive" deduction requirements of section 2055(e)(2) and the reformation provisions of section 2055(e)(3), the terms of the governing instrument are paramount.  As the legislative history explains, the requirement in section 2055(e)(2) that certain trust forms be used was designed in large part to eliminate a trustee's discretion, which might be used to favor noncharitable income beneficiaries.  See <u>Estate of Gillespie v. Commissioner</u>, <u>supra</u> at 376-377; H. Rept. 91-413 (Part 1), <u>supra</u> at 58-60, 1969-3 C.B. at 237-238; S. Rept. 91-552, <u>supra</u> at 86-87, 1969-3 C.B. at 479.  The fact that the

trustee here was not <u>required</u> by the governing instrument to make payouts conforming to those of a CRUT--at least not until the untimely 2003 amendment--is fatal to the estate's position.

The estate also appears at times to suggest that we should treat the 2003 amendment as a qualified reformation under section 2055(e)(3), since it limited payments to the noncharitable beneficiaries to amounts that could be satisfied annually by 5 percent of the fair market value of the trust property.  We disagree.  Since the payments to noncharitable beneficiaries in the original governing instrument were not expressed as specified dollar amounts or a fixed percentage of the fair market value of the trust's assets as required by section 2055(e)(3)(C)(ii), the only remaining option for reforming the trust was a judicial proceeding commenced within 90 days after the return's filing, pursuant to section 2055(e)(3)(C)(iii).  The 2003 amendment was executed beyond that deadline--indeed, well after respondent had contacted the estate for purposes of an examination.[16]

Finally, the estate argues that the actions of the trustee should satisfy section 2055(e)(3) under the doctrine of

---

[16] We also note that the 2003 amendment appears ineffective under Illinois law, insofar as the record discloses.  As discussed <u>supra</u> note 14, under Illinois law, amendment of the trust required the consent of all noncharitable beneficiaries with unexpired interests.  There is no evidence that Migle Francaite consented to the 2003 amendment or that her interest in the trust had expired at the time the amendment was purportedly made.

substantial compliance.  According to the estate, the trustee disclosed in the return statement his intention to follow and be bound by the requirements of a CRUT in operating the trust, the payments to the noncharitable beneficiaries in fact conformed with CRUT requirements, and the 2003 amendment modified the trust so that it complied with CRUT requirements.  Thus, the estate argues, the essential purpose of the 90-day rule in section 2055(e)(3)(C)(iii)--which is to require taxpayers to initiate reformation before being contacted by the Commissioner--has been satisfied by the return statement, and the eventual amendment of the trust in 2003 should be treated as timely, especially given the fact that the trustee in fact adhered to CRUT payout requirements in the interim.  The foregoing should therefore be treated as satisfying section 2055(e)(3) under the doctrine of substantial compliance, in the estate's view.

We disagree.  This Court's application of the substantial compliance doctrine has been summarized as follows:

> The test for determining the applicability of the substantial compliance doctrine has been the subject of a myriad of cases.  The critical question to be answered is whether the requirements relate "to the substance or essence of the statute."  If so, strict adherence to all statutory and regulatory requirements is a precondition to an effective election.  On the other hand, if the requirements are procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly conduct of business, they may be fulfilled by

substantial, if not strict compliance. * * * [<u>Taylor v. Commissioner</u>, 67 T.C. 1071, 1077-1078 (1977); citations omitted.]

Given the antiabuse rationale behind section 2055(e)(3) (as explained in the legislative history previously discussed), we conclude that Congress intended compliance with either section 2055(e)(3)(c)(ii) or (iii) as a precondition to effecting a reformation of a trust to satisfy section 2055(e)(2). Thus, the foregoing requirements relate to the substance or essence of the statute. We accordingly conclude that section 2055(e)(3) requires strict, not merely substantial, compliance.

There was no strict compliance here. Moreover, we are not persuaded that even substantial compliance occurred. The estate's contention that the return statement should substantially satisfy the requirement for prompt initiation of reformation proceedings is unpersuasive. While the executor/trustee may have acted in good faith, the return statement did <u>not</u> put respondent on notice of the trust's defects before audit. The return statement is fairly read as asserting that the trust at issue <u>was</u> a CRUT, as it described the charitable remainder as the "Balance that is residue following 10 year term certain <u>charitable remainder unitrust</u> * * * where * * * the Trustee holds * * * pursuant to the terms and conditions of I.R.C. Sec. 664 and related provisions". (Emphasis added.) None of the efforts to amend the trust, either the unexecuted attempts

in August 2002 or the 2003 amendment in August 2003, was commenced before respondent contacted the estate for an audit-- precisely the circumstances where Congress intended that reformation could not be initiated.  If the estate's position regarding substantial compliance were accepted, then the reformation requirements of section 2055(e)(3) could be circumvented by means of a simple disclosure on the return that a CRUT (or CRAT) was intended, without regard to the actual terms of the trust's governing instrument.

We have considered the estate's remaining arguments and conclude they are without merit or relevance.

For the foregoing reasons,

<u>Decision will be entered</u>

<u>for respondent</u>.