# United States Tax Court

T.C. Memo. 2023-30

ESTATE OF SUSAN R. BLOCK, DECEASED, JULIE B. SAFFIR
AND PETER A. BLOCK, EXECUTORS,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 10618-19.                          Filed March 13, 2023.

————————

*Mark H. Neikrie*, for petitioners.

*Molly H. Donohue* and *Nina P. Ching*, for respondent.

## MEMORANDUM OPINION

COPELAND, *Judge*: This case was submitted to the Court fully stipulated pursuant to Rule 122.[1]  In a Notice of Deficiency dated March 21, 2019, respondent determined a total estate tax deficiency of $140,085 for the Estate of Susan R. Block (Estate).  After concessions,[2] the only issue remaining before the Court is whether the Estate qualifies under section 2055(a) for a deduction from the value of the gross estate

————————

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

[2] The Estate concedes a higher value of real property owned by decedent at her death than the value reported.  The parties agree that the Estate incurred a larger amount of administrative expenses than what was reported on the estate tax return, and that the Estate will qualify for a further deduction for legal expenses incurred during this litigation.

[*2] for the transfer of the remainder interest of the Harriet Katz Trust (Katz Trust).

## *Background*

The facts have been stipulated by the parties.  The Stipulation of Facts (with attached Exhibits) and the First Supplemental Stipulation of Facts are incorporated by this reference.  When the Petition was filed, the Estate was administered in Connecticut, and Executor Julie Saffir and Executor Peter Block (co-executors) resided in California.

I.  *Execution and Amendment of the Katz Trust Instrument*

Ms. Block lived in Connecticut at all relevant times, including at her death on October 21, 2015.  On September 2, 1997, Ms. Block settled the Susan Rubin Block Revocable Trust (Trust).  On September 17, 2015, she executed a will that remained in effect at her death and that provided for the transfer of her residuary estate to the Trust, whose terms she amended and restated on the same day. Ms. Block, Ms. Saffir, and Mr. Block were named as the initial co-trustees.  Upon Ms. Block's death the following month, the Trust became irrevocable pursuant to Article 1.2 of the Trust instrument.  Thereafter, Ms. Saffir and Mr. Block were the only co-trustees of the Trust.  The Trust is governed by the laws of the State of Connecticut.

In Article 4 of the Trust instrument, Ms. Block provided for a subtrust, the Katz Trust, to be funded upon her death.  The Katz Trust would exist for the benefit of Ms. Block's sister, Harriet Katz (Harriet), and then for the benefit of Harriet's spouse, I.W. Katz (I.W.), should he survive Harriet.  Article 4 provides that upon the death of both Harriet and I.W., the property remaining in the Katz Trust shall be distributed to the Jewish Community Foundation of Greater Hartford, Inc. (Foundation).  The Foundation is a charitable organization as described in sections 170(c) and 2055(a).  The co-trustees of the Katz Trust are the same as the co-trustees of the Trust.

Article 4.1 of the Trust instrument states that Ms. Block intends the Katz Trust to be "a charitable remainder annuity trust, within the meaning of Rev. Proc. 2003-57 and § 664(d)(1) of the Code, and the terms of this Section shall be construed to give maximum effect to such intent." Article 4.1(A) directs that an "annuity amount" be paid to Harriet during her life (or to I.W. if he survives her), in an amount "equal to the greater of: (a) all net income, or (b) the sum of Fifty Thousand Dollars ($50,000),

[*3] at least annually." In addition, Article 4.1(I) of the Trust instrument provides:

> Following [Ms. Block's] death this entire Trust, including THE HARRIET KATZ TRUST, shall be irrevocable. However, the Trustee shall have the power, acting alone, to amend THE HARRIET KATZ TRUST from time to time in any manner required for the sole purpose of ensuring that THE HARRIET KATZ TRUST qualifies and continues to qualify as a charitable remainder annuity trust within the meaning of § 664(d)(1) of the Code. The Trustee may not, however, change the annuity period, the annuity amount, or the identity of the Recipient [of the annuity amount].

After respondent initiated an examination of the Estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, in August 2017, the co-trustees executed an amendment to the Trust instrument (First Amendment) with an effective date of October 21, 2015, (Ms. Block's date of death). The First Amendment's stated purpose was to revise Article 4.1(A) to provide that the trustees shall pay from the Katz Trust to Harriet for her life, and to I.W. should he survive Harriet, "an annuity amount equal to the sum of Fifty Thousand Dollars ($50,000), at least annually." The First Amendment removed "all net income" from the determination of the "annuity amount."[3]

II. *Katz Trust Income*

The Katz Trust was funded with assets having a date-of-death fair market value of $761,000. At all relevant times, all assets have been held in the Katz Trust's brokerage account. The chart that follows lists the annual income generated by the Katz Trust's assets and the balance in its brokerage account as of December 31 of years 2016–19:

---

[3] As explained below, we need not determine whether the First Amendment was effective under the terms of the Trust and Connecticut law.

| [*4] Year | Amount of Income Earned During Year | Balance in Brokerage Account as of Dec. 31 |
|---|---|---|
| 2016 | $29,190 | $691,066 |
| 2017 | 23,666 | 677,348 |
| 2018 | 23,380 | 633,859 |
| 2019 | 22,242 | 630,123 |

The Katz Trust has paid $50,000 each year to Harriet from 2015 through at least 2019.

III. *The Estate Tax Return and Notice of Deficiency*

The co-executors timely filed the Estate's Form 706 on or before the filing deadline of July 21, 2016. On that return, the Estate deducted from the value of the gross estate (among other things) the present value of the charitable remainder interest of the Katz Trust, which the Estate calculated on the basis of an annuity amount of $50,000 and the actuarial life expectancies of Harriet and I.W. The Internal Revenue Service (IRS) initiated an examination of the return in August 2017. At the conclusion of the examination, the IRS issued the Notice of Deficiency, in which it disallowed the entirety of the Estate's claimed charitable deduction of $352,085 in connection with the Katz Trust. To date, the co-trustees of the Trust have not commenced any judicial proceeding to reform any provisions of the Trust instrument.

*Discussion*

I. *Burden of Proof*

In general, determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving error. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The Estate does not contend, and the evidence does not establish, that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact. Accordingly, the Estate bears the burden of proof with respect to contesting the deficiency determinations.

[*5] II.     *Split-Interest Charitable Deductions*

For purposes of the federal estate tax, section 2055(a) generally allows a deduction from the value of a decedent's gross estate for transfers for charitable purposes. However, Congress attached special conditions in the case of charitable bequests in the form of split-interest transfers. Such a transfer occurs "where an interest in property passes to a charitable beneficiary while an interest in the same property also passes to a noncharitable beneficiary for less than full and adequate consideration." *Estate of Schaefer v. Commissioner*, 145 T.C. 134, 138 (2015); *see also* I.R.C. § 2055(e)(2). Section 2055(e)(2)(A) disallows a deduction for the charitable remainder portion of a split interest transfer unless (i) the remainder passes in trust and (ii) the trust is a charitable remainder annuity trust (CRAT), *see* I.R.C. § 664(d)(1), a charitable remainder unitrust (CRUT), *see id.* para. (2), or a pooled income fund (PIF), *see* I.R.C. § 642(c)(5).

Congress imposed the section 2055(e)(2)(A) requirement for split-interest remainders in order to remove the "incentive to favor the income beneficiary over the remainder beneficiary by means of manipulating the trust's investments." *Estate of Schaefer*, 145 T.C. at 138 (quoting H.R. Rep. No. 91-413, pt. 1, at 59 (1969), *as reprinted in* 1969-3 C.B. 200, 238; S. Rep. No. 91-552, at 88 (1969), *as reprinted in* 1969-3 C.B. 423, 480). It had come to Congress' attention that taxpayers were claiming charitable deductions for bequests of remainder interests in trusts by making valuation assumptions that were inconsistent with the way the trust assets were actually managed. Where trust assets were invested to maximize the income interest (for instance, investing in stocks that pay high dividends or bonds that pay high interest), the value eventually passing to charity through the remainder interest might bear little relationship to the deduction previously taken.[4] Because of this potential for abuse of charitable remainder deductions, Congress

---

[4] Before enactment of section 2055(e)(2)(A), the charitable remainder deduction was computed on the assumption that the trust assets would grow by 3.5% per year. *See* H.R. Rep. No. 91-413, pt. 1, at 58, *as reprinted in* 1969-3 C.B. at 237. The more general point is that estimating a present value for an unfixed income interest—and thus for the charitable remainder—requires certain upfront assumptions about rates of current return. (In most or all states, a trust that calls for the annual payment of "net income" is generally required to pay out only the "current" portion of the return—such as interest, dividends, and rent—as opposed to sale proceeds or unrealized appreciation. *See, e.g.*, Uniform Principal and Income Act § 102(4) (Unif. L. Comm'n 2008) (providing a default definition of "income" for trust instruments, viz, "money or property that a fiduciary receives as current return from a principal asset").). These assumptions are necessarily blunt and therefore create scope for arbitrage.

**[\*6]** mandated that the annual payout to the noncharitable income beneficiaries be a fixed dollar amount (in the case of CRATs) or a fixed percentage of value of the trust assets (in the case of CRUTs).[5]  *See Estate of Gillespie v. Commissioner*, 75 T.C. 374, 376–78 (1980); *Estate of Tamulis v. Commissioner*, T.C. Memo. 2006-183, 92 T.C.M. (CCH) 189, *aff'd*, 509 F.3d 343 (7th Cir. 2007); *see also* H.R. Rep. No. 91-413, pt. 1, at 58–60, *as reprinted in* 1969-3 C.B. at 237–39; S. Rep. No. 91-552, at 86–87, *as reprinted in* 1969-3 C.B. at 479–80.

If a trust initially fails to qualify as a CRAT or a CRUT, the settlor's estate still may take a charitable deduction if there is a "qualified reformation" of the trust.  I.R.C. § 2055(e)(3)(A).  A qualified reformation cannot occur unless the remainder interest is a "reformable interest" under section 2055(e)(3)(B), meaning that in the pre-reform trust (1) the remainder interest is exclusively charitable and (2) all payments to the noncharitable beneficiaries are "expressed either in specified dollar amounts or a fixed percentage of the fair market value of the property."[6]  I.R.C. § 2055(e)(3)(C)(i) and (ii).  There is an exception to the "specified dollar or fixed percentage" requirement: An initially nonfixed interest will be excused if, within 90 days after the due date for the estate tax return, a judicial proceeding is commenced that results in the trust qualifying as a CRAT or a CRUT, retroactive to the date of the decedent's death.  § 2055(e)(3)(C)(iii).  In such a case, the remainder is deemed a reformable interest just so long as the pre-reform trust designated it as exclusively charitable.

III.  *CRATs*

Section 664(d)(1) generally defines a CRAT as a trust with the following four characteristics:

> A. "[A] sum certain (which is not less than 5 percent nor more than 50 percent of the initial fair market value of all property placed in trust) is to be paid, not less often than annually," to the income beneficiaries, at least one of which

---

[5] Alternatively, the income interest may be nonfixed, but only if the trust is a PIF, meaning that it is managed by the charitable organization that holds the remainder interest.  *See* I.R.C. § 642(c)(5).  A PIF's charity-based governance inherently protects against abuse.

[6] There are a number of other requirements, besides having a charitable remainder and a fixed income interest, for a trust to qualify as a CRAT or a CRUT. (These are discussed below in the case of CRATs.)  Therefore, the qualified reformation rules do not require the trust to *already* be a CRAT or a CRUT.

**[*7]**    is not a charitable organization.  In the case of individual beneficiaries, the annuity may last for either a set period of years (not to exceed 20) or the individual's remaining lifetime.  I.R.C. § 664(d)(1)(A).

B. No payments other than the annuity may be made to the noncharitable beneficiaries.  I.R.C. § 664(d)(1)(B).

C. At the end of the annuity period, the entire remainder is to be transferred to one or more charitable organizations.  I.R.C. § 664(d)(1)(C); *see also* Treas. Reg. § 1.664-2(a)(6)(i).

D. The present value of the remainder interest, determined at the time of the trust's funding, is at least 10% of the initial fair market value of the trust assets.  I.R.C. § 664(d)(1)(D); *see also* Treas. Reg. § 1.664-2(c).[7]

A "sum certain" is defined by Treasury Regulation § 1.664-2(a)(1)(ii) to mean "a stated dollar amount which is the same either as to each recipient or as to the total amount payable for each year of [the annuity] period."

A trust that qualifies as a CRAT is exempt from income taxation (although it is subject to an excise tax on unrelated business taxable income, as defined in section 512).  I.R.C. § 664(c).

IV.    *Attempted Reformation of the Katz Trust*

Article 4.1(A) of the Trust instrument, as it stood on the date of Ms. Block's death, directed the trustees to pay to Harriet or I.W. an "annuity amount equal to the greater of: (a) all net income, or (b) the sum of Fifty Thousand Dollars ($50,000), at least annually."  This provision is not limited to a specific stated dollar amount and therefore violates the requirement of section 664 that the annuity of a CRAT be a "sum certain."  Consequently, the Katz Trust did not qualify as a CRAT at the time of Ms. Block's death (nor, we should note, as a CRUT or a PIF), and the charitable remainder of the Katz Trust was not a reformable interest under the default rules—that is, before considering the exception for judicial reformations (which can excuse an income

---

[7] Treasury Regulation § 1.664-2(b) further provides that a trust is not a CRAT unless the trust instrument forbids additional contributions to the candidate CRAT after its initial funding.  Article 4.1(E) of the Trust instrument contains this prohibition.

**[\*8]** interest that is not expressed as either a sum certain or a fixed percentage of trust assets).

The Estate argues that the First Amendment to the Trust instrument effected a qualified reformation. However, since the First Amendment could not have done so under the default rules, the only remaining possibility was a judicial reformation. Yet the exception for judicial reformations clearly does not apply here. First, the First Amendment was executed sometime after August 2017, far beyond the 90-day period following the due date for the estate tax return (July 21, 2016). Second, the amendment was instituted by the co-trustees alone, rather than by a court. Therefore, the First Amendment fails both components of the exception.

Petitioners ask us to deem the Estate to have substantially complied with the exception. We decline to do so. As we have previously observed, Congress made clear that the rules for qualified reformations are to be construed strictly, in order to prevent abuse of the charitable deduction. *See Estate of Tamulis*, 92 T.C.M. (CCH) at 192–93. Specifically, Congress was concerned that if the reformation regime were overly lenient, taxpayers would not reform trusts to comply with the split-interest rules unless and until the IRS discovered defects upon audit. As the reports of both the House Committee on Ways and Means and the Senate Finance Committee explained:

> In order to prevent [such strategic wait-and-see tactics] from occurring, the committee believes that, in order for a governing instrument of a charitable split-interest contribution to be reformable, either (1) the creator had to make a bona fide attempt to comply with the 1969 Act rules [requiring the trust to be either a CRAT or a CRUT] or (2) the taxpayer must initiate reformation proceedings before the Internal Revenue Service could reasonably be expected to begin audit. The committee believes that these rules will permit the correction of major, obvious defects (such as where the "income" interest is not expressed as an annuity interest or a unitrust interest) so long as the taxpayer initiates reformation proceedings before audit, while allowing the correction of minor defects (such as defects in determining the correct payout in short taxable years, in years of additional contributions, etc.) upon audit so long as there was a good faith attempt to comply with the 1969

**[*9]** Act rules (i.e., the payout is basically expressed as an annuity interest or a unitrust interest).

H.R. Rep. No. 98-432, pt. 2, at 1516–17 (1984); Staff of the S. Comm. on Fin., 98th Cong., Deficit Reduction Act of 1984: Explanation of Provisions Approved by the Committee on March 21, 1984, S. Prt. No. 98-169, vol. 1, at 731–32 (Comm. Print 1984).

Accordingly, this Court strictly construes the exception for judicial reformations. *See, e.g.*, *Estate of Hall v. Commissioner*, 93 T.C. 745 (1989) (finding no qualified reformation of a trust that required net income payments to the income beneficiary, because a judicial proceeding was not timely commenced); *Estate of Tamulis*, 92 T.C.M. (CCH) 189 (finding no qualified reformation of a trust that required net income payments to income beneficiaries, despite statement of intent on estate tax return for payments to be limited to 5% of trust assets). Even if we were to find that the First Amendment was effective for purposes of Connecticut law, it did not effect a qualified reformation for purposes of section 2055(e).

Congress provided no exception for cases, like this one, where the income payment would likely never vary from a fixed amount (based on the initial size of the trust assets and the wording of the income payment provision), or where the co-trustees have in fact always paid the income beneficiaries a fixed amount. We cannot craft an exception that Congress did not provide for. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).

V.      *Revenue Procedures 2003-57 and 2003-59*

The Estate also argues that Revenue Procedure 2003-57, 2003-2 C.B. 257, and Revenue Procedure 2003-59, 2003-2 C.B. 268 (together, Revenue Procedures), allow a trustee to act alone, without court involvement, to amend the terms of a trust at any time to ensure it both qualifies as a CRAT and retroactively qualifies for an estate tax charitable deduction. The Estate argues that the Revenue Procedures are binding upon respondent. We have indeed held that the IRS is generally obligated to follow published administrative positions, including revenue procedures. *See Dixon v. Commissioner*, 141 T.C. 173, 188 (2013) (citing *Rauenhorst v. Commissioner*, 119 T.C. 157, 171–73 (2002)). However, the Revenue Procedures at issue here are unavailing for the Estate.

**[\*10]** The Revenue Procedures provide sample language for a trust to qualify as a CRAT under section 664. For instance, the following is a sample "Limited Power of Amendment" provision:

> This trust is irrevocable. However, the Trustee shall have the power, acting alone, to amend the trust from time to time in any manner required for the sole purpose of ensuring that the trust qualifies and continues to qualify as a charitable remainder annuity trust within the meaning of § 664(d)(1) of the Code.

Rev. Proc. 2003-57, § 4, 2003-2 C.B. at 258; Rev. Proc. 2003-59, § 4, 2003-2 C.B. at 270.

The Estate notes that this sample provision in the Revenue Procedures does not specify a time limit for amending the trust, nor does it require judicial intervention. However, the corollary provisions of the Revenue Procedures must also be considered. Of note, one of the other sample provisions in each Revenue Procedure specifies that the annuity amount is "[*a number no less than 5 and no more than 50*] percent of the initial net fair market value of all property passing to this trust as finally determined for federal estate tax purposes." Rev. Proc. 2003-57, § 4, 2003-2 C.B. at 258 (alteration in original); Rev. Proc. 2003-59, § 4, 2003-2 C.B. at 269 (alteration in original). Therefore, the nonjudicial reformation contemplated by the "Limited Power of Amendment" provision does not involve corrections for "major, obvious defects," such as a provision that allows annual payments to the income beneficiary in the amount equal to the greater of all net income or $50,000. Major defects, "such as where the 'income' interest is not expressed as an annuity interest," require a judicial proceeding to be commenced before an IRS audit might begin (per section 2055(e)(3)(C)(iii)). *See also* H.R. Rep. No. 98-432, pt. 2, at 1517; S. Prt. No. 98-169, vol. 1, at 732.

Moreover, each of the Revenue Procedures cautions: "A trust instrument that contains substantive provisions in addition to those provided in . . . this revenue procedure . . . will not necessarily be disqualified, *but neither will that trust be assured of qualification under the provisions of this revenue procedure.*" Rev. Proc. 2003-57, § 3, 2003-2 C.B. at 257 (emphasis added); Rev. Proc. 2003-59, § 3, 2003-2 C.B. at 269 (emphasis added). The pre-amendment Katz Trust did contain a substantive provision beyond those provided in the Revenue Procedures—namely, the direction that the income beneficiary receives "all net income" if that should exceed $50,000. Because this direction

**[\*11]** squarely violates the paramount rule for CRATs, the Katz Trust falls outside of the Revenue Procedures' representations regarding eligibility for a charitable deduction.

VI.     *Construction of the Pre-Amendment Katz Trust*

The Estate notes that Article 4.1(A) of the original Trust instrument called for an "*annuity amount* equal to the greater of: (a) all net income, or (b) the sum of Fifty Thousand Dollars ($50,000), at least annually." (Emphasis added.)  Moreover, the flush text of Article 4.1 states that Ms. Block intends for the Katz Trust to be "a charitable remainder annuity trust, within the meaning of Rev. Proc. 2003-57 and § 664(d)(1) of the Code, and the terms of this Section shall be construed to give maximum effect to such intent."  These two provisions, according to the Estate, show that the Katz Trust was a CRAT from the beginning and that the First Amendment merely confirmed this characterization.  After all, an "annuity amount" as defined in the Code and regulations is a "sum certain" and so is incompatible with a "net income" provision.

We understand the Estate to be arguing that the "all net income" provision of Article 4.1(A) was void ab initio, so that no qualified reformation—let alone a judicial proceeding—was necessary for the Katz Trust to be a CRAT.  We will assume for the sake of argument that under Connecticut law, the original Article 4.1(A) was ambiguous and that, under the Connecticut canons of construction, the phrase "all net income" was ineffectual.  But that assumption does not necessarily entail that the Katz Trust was a CRAT from the beginning.  That matter will depend on the proper construction of section 664(d)(1)(A), which provides that a CRAT is (among other things) a trust "from which a sum certain . . . is to be paid, not less often than annually, to one or more persons."  Perhaps this provision could lead to two interpretations, either (1) the trust's governing instrument *unambiguously* provides for a sum-certain annuity or (2) the governing instrument *once properly construed* (such that any and all ambiguities are resolved in accordance with applicable state law) provides for a sum-certain annuity.

The first interpretation accords much more soundly with Congress' intent with regard to section 664.  That intent was, as discussed above, to deny both income and estate tax charitable deductions for remainder interests unless the amount going annually to the noncharitable beneficiaries is certain and unmanipulable.  *See* H.R. Rep. No. 91-413, pt. 1, at 59, *as reprinted in* 1969-3 C.B. at 238; S. Rep. No. 91-552, at 88, *as reprinted in* 1969-3 C.B. at 480.  If we were to find

**[\*12]** that trusts can be CRATs when the noncharitable payment is simply *more likely than not* required to be a sum certain, we would subvert Congress' evident goal of removing as much uncertainty as possible from the preset-value calculation of remainder interests. Therefore, we conclude that under the proper interpretation of section 664(d), the pre-amendment Katz Trust was not a CRAT. And because the trustees did not effect a qualified judicial reformation, the entire charitable deduction must be denied under section 2055(e).

We have considered all the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*